John DEMJANJUK, Petitioner–Appellant,

v.

Joseph PETROVSKY, et al.,
Respondents–Appellees.

No. 85–3435.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 3, 1993.

Decided Nov. 17, 1993.

Rehearing and Suggestion for
Rehearing En Banc Denied
Feb. 24, 1994.

. Edward Marek, Fed. Public Defender (briefed), Federal Public Defender's Office, Cleveland, OH, Michael E. Tigar (argued and briefed), University of Texas Law School, Austin, TX, for petitioner-appellant.

Patty Merkamp Stemler (argued and briefed), Dept. of Justice, Crim. Div., Appellate Section, Washington, DC, for respondents-appellees.

Before: MERRITT, Chief Judge; KEITH, Circuit Judge; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

The question before the court is whether attorneys in the Office of Special Investigations (OSI), a unit within the Criminal Division of the Department of Justice, engaged in prosecutorial misconduct by failing to disclose to the courts and to the petitioner exculpatory information in their possession during litigation culminating in extradition proceedings, which led to the petitioner's forced departure from the United States and trial on capital charges in the State of Israel. For the reasons stated herein we conclude that OSI did so engage in prosecutorial misconduct that seriously misled the court.

## I.

### A.

This matter is before the court on its own motion, pursuant to an order entered on June 5, 1992. In the June 5 order we stated that information had come to the attention of the court which required us to determine whether this court's affirmance of the district court's denial of John Demjanjuk's petition for habeas corpus relief from an extradition warrant was improvident. See *Demjanjuk v. Petrovsky*, 776 F.2d 571 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986).

The order directed the respondents to address certain questions related to the identification of Demjanjuk as the notorious Ukrainian guard at the Nazi extermination camp near Treblinka, Poland called by Jewish inmates "Ivan the Terrible" (Ivan Grozny). The order also set the matter for oral argument on August 11, 1992. The Department of Justice appeared for the respondents.

Following briefing and oral argument, the court entered an order on August 17, 1992, appointing a Special Master pursuant to FED. R.CIV.P. 53(c). The Special Master was directed to take testimony and prepare a report on the issue of whether failure of government attorneys to disclose exculpatory information in their possession constituted prosecutorial misconduct or fraud upon the court that misled the court into allowing Demjanjuk to be extradited. Pursuant to the government's motion, a clarifying order was entered on August 31, 1992. Copies of the June 5 and August 17 orders are annexed to this opinion as Appendix 1 and Appendix 2, respectively.

### B.

The Special Master, United States District Judge Thomas A. Wiseman, Jr. of the Middle District of Tennessee, conducted extensive hearings over a period of approximately six months and received other evidence by deposition. After closing proceedings following oral arguments on April 30, 1993, Judge Wiseman prepared a comprehensive report (S.M. Report), which he filed with this court on June 30, 1993.

Because the district court's extradition order had been based primarily on the record of earlier denaturalization proceedings against Demjanjuk, the master included within the scope of his inquiry actions of government attorneys in the 1981 denaturalization case and later deportation proceedings as well as in the extradition case. Chief Judge Frank Battisti conducted both the denaturalization and the extradition proceedings. The district court's opinion in the denaturalization proceedings is reported at 518 F.Supp. 1362 (N.D.Ohio 1981) *aff'd per curiam*, 680 F.2d 32 (6th Cir.1982), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982). The district court's opinions in the extradition proceeding are reported at 612 F.Supp. 544 and 612 F.Supp. 571 (N.D.Ohio 1985).

Demjanjuk's claims of misconduct consisted of the government's failure to disclose information that pointed to another Ukrainian guard at Treblinka, Ivan Marchenko, as "Ivan the Terrible." Demjanjuk's denaturalization and deportation orders were based on his alleged misrepresentations concerning his wartime whereabouts and activities at the time he applied for entry into the United States as a displaced person and in his application for citizenship. These orders were based primarily, although not exclusively, on Demjanjuk's failure to disclose his alleged wartime activities as "Ivan the Terrible" at Treblinka. The extradition order was based solely upon the district court's finding that Demjanjuk was Ivan the Terrible.[1] This was the charge on which Israel sought his extradition, and on which he was ultimately tried and convicted by an Israeli trial court. As the Supreme Court of Israel stated, "the fact the appellant [Demjanjuk] was a guardsman at the Trawniki unit" and similar background evidence "was not the main matter which was set before the authorities in the United States and before the court in Israel, but it was part of the collection of factual information." (Translation of the final section of the decision of the Supreme Court of Israel in Demjanjuk's appeal at 21). The "main matter" before the courts in both countries in all the proceedings, as the Supreme Court of Israel observes, and the records of proceedings in the United States establish, was the "Ivan the Terrible" charge.

We directed the parties to file briefs setting forth their views and arguments respecting the Special Master's report and set the matter for oral argument on September 3, 1993. Following full briefing and extended oral argument the matter was submitted for decision.

## II.

■ The master made findings of fact, largely based on credibility determinations, which absolved the government attorneys of deliberately and intentionally failing to disclose information that they considered exculpatory. Judge Wiseman also found that the various proceedings against Demjanjuk were not affected by political pressures from congressional sources and various Jewish groups in the United States. S.M. Report at 27–28. We are required to accept the master's findings of fact unless clearly erroneous. FED. R.CIV.P. 53(e)(2).

## A.

The master considered six specific claims by Demjanjuk that acts and omissions of OSI attorneys described therein constituted prosecutorial misconduct or fraud on the court. These claims related to statements of various witnesses and a report of a Polish investigation that had come into OSI's possession. In each case the master found that government attorneys had failed to disclose or produce documents or other materials that should have been subject to disclosure or production under outstanding discovery requests and FED.R.CIV.P. 26(e). In each instance, however, the master exonerated the government attorneys on one or more of the following findings: either that the attorneys did not believe the materials were within the scope of outstanding discovery requests; that they believed in good faith that the materials did not relate to Demjanjuk; or that a particular attorney then responsible for complying with requests was not aware of the existence of specified materials even though other attorneys who worked on the Demjanjuk cases did know of and had seen the materials.

In making these determinations, the master considered each of the six claims in light of the successive sets of interrogatories filed by Demjanjuk during the denaturalization proceedings. At the time he filed the first set of interrogatories Demjanjuk filed a request for production of documents and stated

---

1. In the extradition proceedings the district court considered evidence that Demjanjuk was trained as a concentration camp guard at a facility in Trawniki, Poland. The government based its claim that Demjanjuk had served at Trawniki, and later at the Sobibor extermination camp, on a passage from a book about the Holocaust, and an identification badge supposedly issued to guards who were trained at Trawniki. The district court concluded that a decision as to the validity of "the Trawniki card" identifying Demjanjuk was not required in order to support extradition. 612 F.Supp. at 553.

that both were to be treated as of a continuing nature. Question 2 of the first set of interrogatories asked whether a statement had been obtained from any person whose name and address had been sought in Question 1. The respondents argued that they had complied fully by providing names of persons who claimed to have any knowledge of Demjanjuk's alleged activities at Treblinka as requested in Question 1 of the first set. The master refused to accept the OSI attorneys' arguments, stating:

> Thus, the defendant specifically asked for the names of all witnesses to the defendant's alleged actions, and whether statements had been obtained from those people. When read in conjunction with Mr. Demjanjuk's first request for production, he clearly had requested all witness statements.

S.M. Report at 165. Similarly, the master found that the government never supplied the names of several witnesses whose identity was required to be disclosed by Question 1.

Another set of interrogatories asked specifically about foreign government reports concerning activities of Ivan the Terrible at Treblinka. The previously described materials from the Polish investigation of the Treblinka atrocities were in the government's possession in 1979, but were not produced until 1982, after the conclusion of the denaturalization proceedings. This failure was an "oversight," according to one government attorney. S.M. Report at 171. Finally, and most significantly, as early as 1978 or 1979 the government had information from official sources within the Soviet Union indicating that there were two Ukrainian operators of the gas chambers at Treblinka—Ivan and Nikolai—and that "Ivan Grozny" was a man named Ivan Marchenko, not Ivan Demjanjuk.

### B.

The master found some of the respondents' failures "excusable," some "inadvertent," and most to have resulted from the government attorneys' mistaken understanding of the scope of their duty of production under the discovery requests made by Demjanjuk. Judge Wiseman stated:

> [A] careful reading of Mr. Demjanjuk's discovery requests demonstrates that he asked for virtually every piece of evidence that is at issue in these proceedings. As demonstrated, the government did not provide the evidence because it believed that it was under no duty to do so. The heart of the discovery problems, therefore, was a tragic misunderstanding.

S.M. Report at 204. Noting that no fewer than eight government attorneys worked on the Demjanjuk denaturalization case, the master blamed the misunderstanding with respect to the duty to disclose and produce materials on "the unstable and fractious character" of the prosecution team. The difficulties resulting from rivalries between OSI and the United States Attorney's office in Cleveland, and the frequent changes of attorneys assigned to the case were compounded, the master found, by the attitude of the government trial attorneys that "at times bordered on gamesmanship." S.M. Report at 205.

The master found that, in interpreting Demjanjuk's requests and interrogatories so narrowly, the government attorneys were "playing hardball." S.M. Report at 172. Judge Wiseman pointed out that when questions arose as to whether the later of two requests for information from foreign governments was redundant or inconsistent with the first request, the government attorneys had several options. They could have complied with the requests; they could have sought a protective order if they felt the requests were redundant or oppressive; or they could have contacted defense counsel by telephone for a clarification. As the master stated:

> Each of these options would have had the advantage of providing the defense either with the requested information, or with notice of the misunderstanding. Although I believe that the consequences were unintended, the course they took—silently imposing a limitation on the earlier interrogatory—almost certainly misled [defense

counsel] and endangered Mr. Demjanjuk's ability to mount a defense.

S.M. Report at 175.

## III.

The Special Master was disturbed by the fact that the government attorneys continued to be less than forthcoming with materials from foreign sources after agreeing at a pretrial hearing in the denaturalization case that the government had superior access to such materials and should make every effort to obtain them and furnish them to the defense.

## A.

Undisclosed materials from the former Soviet Union and Poland form the principal basis for Demjanjuk's contention that OSI attorneys engaged in misconduct that amounted to fraud. The Supreme Court of Israel reversed Demjanjuk's conviction as Ivan the Terrible and acquitted him based largely on statements of Ukrainian guards at Treblinka who clearly identified Ivan Marchenko as Ivan the Terrible. The Israeli Supreme Court found that these statements raised a reasonable doubt as to Demjanjuk's guilt even though eighteen Jewish survivors of Treblinka and one German guard there had identified him as "Ivan the Terrible" from photographs made in 1942 and 1951.

The government did not have all of the statements relied upon by the Israeli Supreme Court in its possession during the various proceedings against Demjanjuk in this country. Some of the statements came from Russian and Ukrainian sources after the breakup of the Soviet Union. Demjanjuk maintains, however, that during its investigation prior to the denaturalization trial the government did obtain from official sources in the Soviet Union and Poland documents and statements that should have raised doubts about Demjanjuk's identity as Ivan the Terrible, and some of which named Marchenko as the wanted "Ivan." Because the OSI attorneys consistently followed an unjustifiedly narrow view of the scope of their duty to disclose, and compartmentalized their information in a way that resulted in no investigation of apparently contradictory evidence, Demjanjuk and the court were deprived of information and materials that were critical to building the defense.

## B.

We briefly describe the claims related to five of these undisclosed documents and groups of documents, indicating with parentheses the date each came into the possession of one or more attorneys at OSI:

1. **The Fedorenko Protocols (1978)**

This evidence consists of statements received from the former Soviet Union including the statements of two former Treblinka guards, Malagon and Leleko, who discussed the presence of a gas chamber motorist named Marchenko. Both the Leleko and Malagon statements are by Treblinka guards who demonstrate great familiarity with the operations and the operators of the gas chambers of Treblinka. They both name a man other than the accused as the notoriously cruel "Ivan the Terrible" who ran the motors of the gas chambers. Excerpts from the Leleko and Malagon statements are annexed to this opinion as Appendices 3, 4 and 4–A respectively. Also accompanying this evidence was a list of guards transferred out of the Trawniki, Poland training camp on which Demjanjuk's name did not appear. The survivors identified Ivan the Terrible as one of the Ukrainian operators of the Treblinka gas chambers ("motorist"), who was especially cruel and committed atrocities upon the Jewish victims as he herded them into the lethal chambers.

2. **The Danilchenko Protocols (1979)**

This evidence consists of statements received from the former Soviet Union including a second statement from the former Treblinka guard Malagon who stated that an "Ivan Demedyuk or Ivan Dem'yanyuk" worked at Treblinka as a cook, that a guard named Marchenko operated the gas chambers, and who stated that the man he knew as "Ivan Demedyuk or Ivan Dem'yanyuk" was not pictured in the photospread shown to him. Jt.App. 178, 179. Danilchenko, a guard at the Sobibor, Poland death

camp, stated that Demjanjuk was a fellow guard at Sobibor and that they were transferred from Sobibor to Flossenburg, Germany together. Respondent's Appendix 221–22. Although these statements are inculpatory to the extent they place Demjanjuk at the Sobibor and Flossenburg concentration camps, Demjanjuk contended that he was entitled to have them produced because they were exculpatory with respect to the Treblinka "Ivan" claims and would permit him to refute the claim that he was at Sobibor and Flossenburg.

### 3. The Dorofeev Protocols (1980)

This evidence received from the former Soviet Union consists of statements of five Soviets who served at the Trawniki, Poland training camp for guards. Only one individual recalled the name Demjanjuk and although he identified two of Demjanjuk's photos in a three-photograph photospread, he qualified his identification by stating that his recollection of Demjanjuk was poor. Three of the others stated that transfers between camps were routed through Trawniki which served as a distribution center. Jt.App. 155. Again, this evidence has both inculpatory and exculpatory elements, but Demjanjuk argued that he was entitled to the statements demonstrating that four of the five Trawniki witnesses were unable to identify him and that the fifth was very tentative.

### 4. "Polish Main Commission" List (1979)

This evidence consists of an article published by the Polish Main Commission, a government body, which partially lists names of known guards at Treblinka. The name Ivan Marchenko appears on the list. Demjanjuk's name does not appear on the list. The Commission conducted an official investigation of the activities carried on at Treblinka in connection with a more extensive investigation of Nazi war crimes in Poland. Jt. App. 502, 556. At the time OSI received this list of more than 70 names containing Marchenko's name, but not that of Demjanjuk, it already had Leleko's

statement identifying "Nikolai" and Marchenko as two different people who operated the gas chambers. (Nikolai was identified in documents later received from former Soviet sources as Nikolai Shalayev, who gave a statement in 1950 that he and Marchenko were the two gas chamber operators. This evidence was admitted by the Israeli Supreme Court.) Demjanjuk contended that any attorney considering the Polish list in combination with the Leleko statement would have realized that information from foreign governments pointed to Marchenko, not Demjanjuk, as Ivan the Terrible and should have produced them in response to Questions 1 and 2.

An OSI attorney, George Parker, who was lead counsel in the denaturalization case prior to his resignation in 1980, prepared extensive notes describing and commenting on the evidence in that case sometime before the trial. Jt.App. 152, 167. In those notes he stated that Leleko had named "Nickolay" and Marchenko as motorists and that Marchenko had sword-cut women's breasts, one of the atrocities charged against Demjanjuk as Ivan the Terrible. Before the Special Master, Parker testified that he did not make the connection, because Malagon's statement indicated that Nikolai or Nickolay was Marchenko's first name. Thus, the other guard was Ivan, and, he believed, Demjanjuk. Transcript, Nov. 12, 1992, at 80.

### 5. OTTO HORN INTERVIEW MEMORANDA (1979)

This evidence consists of "Reports of Interview" from an OSI investigator, Bernard Dougherty, and a historian, George Garand, written in 1979 contemporaneously with an interview of Otto Horn, a former SS guard at Treblinka, at which Horn identified Demjanjuk as a Treblinka guard. Although Horn identified Demjanjuk in a photospread, the investigator and historian both wrote in separate memoranda that this identification occurred only after Horn noted that Demjanjuk's photo appeared in both of the two photospreads and while Demjanjuk's photo from the first photospread

lay facing up during his examination of the second photospread. Horn later testified that the photo in the first spread was not visible to him when he made the identification from the second.

These memoranda were addressed to Arthur Sinai, Deputy Director of OSI. A routing slip from Sinai directed "Stacey" to make two copies of one of these reports and forward one to Norman Moscowitz. Jt.App. 586. At that time Moscowitz was working with Parker on the Demjanjuk denaturalization case. He became lead counsel following Parker's resignation, and actually tried the case.

The statements were not produced to Demjanjuk or disclosed to the district court in the denaturalization proceedings when that court received a videotaped deposition of Horn taken some time after the initial identification from the two photospreads. In the videotaped deposition Horn stated that he did not see the two photospreads at the same time— that the first one was put away out of his sight before he examined the second one. The district court stated that it found "no aberrations in the conduct of these identifications which may be said to detract from the identifications Horn made." 518 F.Supp. at 1372.

Moscowitz testified before the Special Master that he did not read the investigator and historian's reports prior to the denaturalization trial, although he did not deny receiving them. Transcript, Jan. 14, 1993, at 91–93. Demjanjuk claims that the OSI attorneys committed misconduct and fraud on the court in presenting Horn's videotaped identification testimony without producing the reports that detailed a highly suggestive identification procedure. Relevant portions of the Dougherty and Garand reports are annexed to this opinion as Appendices 5 and 6, respectively.

### C.

There is a further consideration with respect to the Fedorenko Protocols. Following the district court's judgment in the denatu-

ralization case, Norman Moscowitz who was then chief trial counsel in that case, wrote a letter to Demjanjuk's counsel, John Martin, with a copy to the trial judge. Jt.App. 147. In this letter Moscowitz stated that documents had been received from the Soviet Union (the Dorofeev Protocols) just before trial and that OSI, for various reasons, had not disclosed or produced them to Demjanjuk's counsel. The letter characterized these materials as "further incriminatory information and support for the government's case." The letter also stated that Demjanjuk was being advised of the existence of these documents in order to make "the record of discovery complete."

Demjanjuk filed a motion for a mistrial, which the district court treated as a motion for a new trial. The district court held a hearing on the motion on May 4, 1981. Demjanjuk's attorneys argued that the Dorofeev information would have been valuable to the defense, that four of the five former Trawniki guards had failed to identify Demjanjuk while only one had identified him. Counsel asserted that it would have been important for the defense to contact these men, particularly to learn if they had been issued identification badges like the "Trawniki card" relied upon by the government. The expert witness at the trial who had testified that the card appeared to be authentic had stated that the one exhibited there was the only one he had ever seen, though he was a Holocaust historian.

The government argued that it had no agreement or duty to supplement answers to interrogatories and requests. Even if there was a duty to produce the documents, the government asserted, Demjanjuk was not prejudiced by this oversight. During the government's argument, attorney Moscowitz told the court that he was perfectly willing to give the defense the witness' statements "as everything else." At this time Demjanjuk's counsel only had the letter describing the contents of the statements, not the Dorofeev statements themselves.

Chief Judge Battisti ruled that the government had a duty to provide the names of the five witnesses before or during the trial. He then ordered government counsel to turn

over copies of the statements to the defendant and to the court, and recessed the hearing until Demjanjuk's counsel and the court had an opportunity to review them. Following the recess, the district court heard further argument and then asked for briefs from the parties before adjourning the hearing. Jt.App. 767. The court ultimately ruled that the Dorofeev materials were cumulative and in fact supported the government's arguments that Demjanjuk had been at Trawniki and that Trawniki was a training center for guards assigned to all of the extermination camps, including Sobibor as well as Treblinka. 518 F.Supp. at 1384–86.

Demjanjuk argues that, given the district court's ruling that the government had a duty to disclose and produce the Dorofeev Protocols, Moscowitz should have realized that the same duty applied to the Fedorenko Protocols, which also came from the Soviet Union. Though Moscowitz represented that his post-trial letter disclosing the existence of the Dorofeev Protocols was written in order to make the record of discovery complete, he still did not disclose or produce the Fedorenko documents, which had been in OSI's possession since 1978.

In his testimony before the Special Master, Moscowitz admitted reading the Fedorenko documents prior to the denaturalization proceedings. Neither he nor Parker, who also read them, felt that they supplied any help in the Demjanjuk cases. According to the master, these documents disappeared in the winter of 1981 after the denaturalization trial and only resurfaced in 1991 in response to a Freedom of Information Act case by Congressman James Traficant of Ohio. At oral argument before this court, government counsel stated the Fedorenko documents didn't actually disappear: "They were just put back in the Fedorenko files. They came with the Fedorenko case and when the Demjanjuk case was over, they went back to their Fedorenko file."

It is hard to credit this explanation. The Fedorenko file, particularly the Leleko and Malagon statements, contain significant evidence tending to show that a person other than Demjanjuk was in fact "Ivan the Terrible of Treblinka." The record contains

copies of a letter dated October 23, 1978, from the General Counsel to Martin Mendelsohn, chief of litigation in the "Special Litigation Unit" (SLU) of the Department of Justice, predecessor to OSI. Jt.App. 215–17. The letter discusses the necessity of winning the Demjanjuk case, and has as attachments all of the SLU's memoranda on Demjanjuk. Among these memoranda is one from Parker and Moscowitz to the State Department requesting assistance in obtaining further information from the Soviet Union. The memorandum notes that the Soviets had sent materials in June 1978 relating to the investigation of Fedorenko (the Fedorenko Protocols), and continues: "Please thank the [Soviet] Ministry for sending these materials which have been very useful." Jt.App. 218. The October 23, 1978 letter shows that a copy was placed in the Demjanjuk file. It seems clear that even if the Fedorenko documents were "just put back in the Fedorenko files," anyone working with the Demjanjuk files had the substance of those documents, if not the documents themselves, available.

There were clear signals that the Fedorenko documents were significant in the Demjanjuk investigation. As we have noted, the Fedorenko Protocols contained, inter alia, the statements of Soviet citizens Malagon and Leleko, both guards at Treblinka, who identified Marchenko as an operator of the gas chamber. Leleko's statement clearly said that there were two Ukrainian operators of the gas chambers, "Marchenko and Nikolay" and identified Marchenko as the "motorist" who committed some of the very atrocities with which Demjanjuk was charged. Leleko said that Marchenko mutilated Jewish victims, cutting off breasts of women. Demjanjuk argues that this evidence provided the strongest possible support for their basic contention in all the proceedings that Demjanjuk was the victim of misidentification. Though the Treblinka survivors who identified Demjanjuk as Ivan the Terrible probably believed they recognized him from the two photographs exhibited to them, it had been 30 to 40 years since any of them had their last opportunity to observe the Ukrainian guard Ivan Grozny. On the other hand, Leleko's statement was made immedi-

ately after the war. The Israeli Supreme Court considered more eyewitness survivor identifications than the American courts; yet, it found that statements made to Soviet authorities identifying Marchenko as "Ivan" raised sufficient doubt about the identification of Demjanjuk to require reversal of Demjanjuk's conviction and his release. It seems clear that the American courts considering Demjanjuk's fate should have had those documents that were in OSI's possession in 1981 that pointed to Ivan Marchenko as Ivan the Terrible.

## IV.

After working on the Demjanjuk case for several years, OSI attorney George Parker became convinced that OSI lacked sufficient evidence that Demjanjuk was Ivan the Terrible of Treblinka. On February 28, 1980, Parker wrote a memorandum entitled "Demjanjuk—A Reappraisal," addressed to Walter Rockler, Director, and Allan Ryan, Deputy Director of OSI, setting forth his doubts. He urged the addressees to read the memorandum and be prepared to make a decision about how to proceed with *Demjanjuk* (the denaturalization case had been pending for more than two years and was nearing trial) in the near future. This memorandum is annexed hereto as Appendix 7.

## A.

Parker's memorandum discussed the background of the Demjanjuk investigation, which began when attorneys in the SLU became aware of a brief reference to Demjanjuk at Sobibor in a book called *Lest We Forget*. The book also referred to a document later denominated the "Trawniki Card," containing a photograph identified as being that of Ivan Demjanjuk. It was only after Treblinka survivors who were interrogated by Israeli police identified the person pictured on the card as a guard at Treblinka rather than at Sobibor that the SLU shifted its focus and began preparing a case against Demjanjuk as Ivan the Terrible. All other evidence, including the statements of Danilchenko and two other Ukrainian guards questioned by Soviet authorities, identified

Demjanjuk as a guard at Sobibor and Flossenburg, but not at Treblinka.

Furthermore, Parker's memo pointed out, both the Polish and Soviet governments had compiled lists of guards at Treblinka, and Demjanjuk's name appeared on neither one, though "[t]he two Ukrainians who incessantly worked at the gas chambers were well known." This portion of the memorandum concludes: "Given these circumstances it is disturbing, as Norman Moscowitz has pointed out repeatedly, that Demjanjuk's name does not appear on either list."

After reviewing the available admissible evidence and the "flaws" with the Treblinka evidence, the memorandum sets forth Parker's views of "Strategic Options; Ethical Responsibilities" of OSI as he sees them. This section of the memorandum begins with these words:

> We have little admissible evidence that defendant was at Sobibor yet serious doubts as to whether he was at Treblinka. Even if we may be comforted that we may have the right man for the wrong act, the ethical cannons [sic] probably require us to alter our present position.

The memorandum then sets forth four options and Parker's recommendation as to each.

Option 1 would be to maintain the status quo, that is, to "[p]roceed with the Treblinka case as presently plead." (The denaturalization complaint did not mention Sobibor or Trawniki, only Treblinka.) Assuming canons of ethics that caution against prosecutors going forward in a criminal case in which they have serious doubts apply to the denaturalization case, Parker "strongly recommended" against this option. Parker recognized that a denaturalization proceeding is technically a civil rather than a criminal action, but expressed the view that the consequence to a defendant who loses such a case—deprivation of citizenship—is so severe that this stricture of the canons should be followed.

Option 2 would be to strike claims that Demjanjuk was at Treblinka and substitute claims that he was at Trawniki and Sobibor. Parker described this course of action as

"tactically suicidal" and "a strategic blunder," primarily because it placed too much reliance on the Trawniki Card.

Option 3 would be to dismiss the case—at least temporarily—and attempt to beef up the Sobibor evidence. The memorandum recommended against this option because of "largely political" negative factors, and the possibility that the court might not permit refiling.

Option 4 would be to amend the pleadings to add allegations that Demjanjuk served at Sobibor and Trawniki in addition to the allegation that he was Ivan the Terrible of Treblinka. This would shift the focus from testimony of Treblinka survivors describing the heinous crimes of Ivan the Terrible to a mere showing that Demjanjuk was a Russian POW trained by the Germans as a guard, who served as a guard at an extermination camp. Parker did not make a recommendation with respect to Option 4, but repeated his opinion that a change in course was absolutely required by ethical considerations.

Parker's superiors eventually decided to amend the pleadings to add allegations about Sobibor and Trawniki, but to proceed with the case on the basis of proving that Demjanjuk was Ivan the Terrible and to rely principally on photo identifications by Treblinka survivors. Parker resigned from the Department of Justice before the denaturalization trial and Norman Moscowitz took over as lead attorney for OSI.

### B.

The Special Master found that the Parker memorandum is "authentic." S.M. Report at 100–01. This was an issue, because no one in OSI could locate it; Parker produced a copy of the memorandum and cover letter on October 8, 1992, in proceedings before the master.

Rockler testified that he could not remember receiving the memorandum. Ryan testified that he could not have received it, or he would have done something about it. The master stated that Ryan's testimony should be taken "with a grain of salt," and we agree with this assessment. Moscowitz testified that he did not receive the memorandum, but

was aware of Parker's doubts about the identifications of Demjanjuk by survivors of Treblinka. The master found that there was a meeting shortly after the memorandum was written at which the question of amending the pleadings in the Demjanjuk case was discussed. Although there was considerable inconsistency in the testimony of the attorneys who attended the meeting, the master found that all were telling the truth to the extent they remembered the meeting at all. The master further concluded that Rockler found no irreconcilable discrepancies in the Demjanjuk evidence and that the evidence in hand was sufficient to go forward. On that basis, Parker's views were rejected by Parker's colleagues within OSI. S.M. Report at 103–09.

The master absolved Moscowitz of blame for not sharing Parker's ethical concerns and proceeding to prosecute the denaturalization case with the Ivan the Terrible allegations as its centerpiece. Moscowitz testified that he had concluded that while Demjanjuk's primary duties were at Treblinka, the Trawniki training camp was also a transfer point for guards. Thus, it was not impossible for Demjanjuk to have been at Treblinka at times the survivors claimed they saw him operating the gas chambers and committing other atrocities there, and to have served at Sobibor at other times. S.M. Report at 113–18.

The "most striking aspect" of the Parker memorandum, according to the master, "is its complete silence regarding the references [in the Fedorenko documents] to a man named Marchenko at the gas chambers." S.M. Report at 112. Parker's doubts were based on the apparent impossibility of Demjanjuk's having been a guard at both Sobibor and Treblinka during the relatively brief time both were in operation, and his uneasiness about the survivor identifications so long after the events. Parker did not make the Marchenko connection. Moscowitz testified that when he became aware of the evidence identifying Marchenko as Ivan the Terrible, he assumed that Demjanjuk had adopted Marchenko (a common Ukrainian name, and Demjanjuk's mother's maiden name) as an alias. The problem with this

explanation is that Moscowitz also relied on the Trawniki card containing Demjanjuk's name and photograph as significant evidence that he was Ivan the Terrible of Treblinka. It is hard to understand how he could have been sent from Trawniki to Treblinka as Demjanjuk and then assumed the name Marchenko while working there. Surely the meticulous Germans in charge at Treblinka would have noticed the discrepancy.

In his memorandum, Parker wrote that adopting Option 4, amending the pleadings to add Sobibor and Trawniki allegations, would be "simply a ruse to avoid the ethical problems" identified in Option 1. The master found that amending in this way was not a ruse because Moscowitz and others believed in good faith that transfers did take place through Trawniki between camps and that Demjanjuk had served at both Treblinka and Sobibor. S.M. Report at 123.

While recognizing the significance of the Parker memorandum as a document which raised important questions about the handling of the Demjanjuk case, the Special Master concluded that it was not a "smoking gun" insofar as his inquiry was concerned. The master held that because OSI attorneys acted on the basis of good faith belief in Demjanjuk's guilt as Ivan the Terrible their disagreements with Parker's conclusions were irrelevant with respect to the issue of fraud on the court. S.M. Report at 117. While we agree that the Parker memo alone would not be a sufficient basis for a finding of fraud on the court, it raised a clear warning that there were ethical perils in continuing to prosecute Demjanjuk as Ivan the Terrible. When his superiors and colleagues at OSI refused to heed his warning, Parker resigned.

## V.

### A.

The government argued in its brief to the Special Master that mere nondisclosure can never be fraud on the court. The master rejected the argument as a misinterpretation of this court's statement in *H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118 (6th Cir.1976), that "[a]llegations of non-

disclosure during pretrial discovery are not sufficient to support an action for fraud on the court." The government quoted this statement out of context. When the context is examined, it is clear that the court in *Porter* was concerned with a claim of fraud based on an attorney's failure to disclose documents not requested by opposing parties that pertained to confidential disclosures from a client. The master stated, correctly we believe, that it would be error "to exclude from the definition of fraud on the court intentional, fraudulent nondisclosure during discovery." S.M. Report at 187–88.

■ The Special Master set forth the elements of fraud upon the court as consisting of conduct:

1. On the part of an officer of the court;
2. That is directed to the "judicial machinery" itself;
3. That is intentionally false, wilfully blind to the truth, or is in reckless disregard for the truth;
4. That is a positive averment or is concealment when one is under a duty to disclose;
5. That deceives the court.

As shown by his description of the third element, and repeated in his opinion, the master held that the intent requirement "is satisfied by proof of actual intent to defraud, of wilful blindness to the truth, or of *a reckless disregard for the truth.*" S.M. Report at 185–86, 190 (emphasis added).

### B.

We have trouble squaring this definition with the master's ultimate conclusion. The master stated that "a careful reading of Mr. Demjanjuk's discovery requests demonstrates that he asked for virtually every piece of evidence that is at issue in these proceedings," but the government did not provide the evidence because it believed it was under no duty to do so. S.M. Report at 204. The government attorneys had the same obligation as the master to give these requests a "careful reading." The master also faulted Demjanjuk's attorneys for failing to pursue every lead provided by the responses that the government did make. That may be a

correct assessment as to some leads, but Demjanjuk's attorneys were depending on government attorneys to root out information in the possession of foreign nations and to provide it. This was so because only the government has the contacts and resources necessary to obtain information from foreign governments, and because a government attorney agreed to do just that at a pretrial hearing before a magistrate. S.M. Report at 157.

This case involves more than discovery obligations, however. Ryan testified that he had stated many times that OSI had a policy and practice of turning over exculpatory information even if it had not been requested in discovery. Transcript, Jan. 29, 1993, at 32–40. The other OSI attorneys testified that they knew of no such policy.

While the denaturalization case was before the Supreme Court on Demjanjuk's petition for certiorari, Demjanjuk received from private sources a copy of the August 1979 letter from a Polish official to Martin Mendelsohn concerning the report of the Polish Main Commission. Demjanjuk requested information about the Polish report. Moscowitz responded and sent a part of the Commission materials. John Martin, Demjanjuk's attorney, immediately wrote to Allan Ryan, then director of OSI, requesting copies of the document described in the letter. OSI attorney Bruce Einhorn drafted a response and sent it to Ryan for approval. This second response stated that "all relevant and discoverable documents in the Government's possession have been provided to you under the Federal Rules of Civil Procedure." The letter went on to decline the request for "further discovery." The master found that this letter was sent to Martin with a copy to Judge Battisti, apparently with Ryan's approval. S.M. Report at 135–36. These responses do not square with Ryan's professed policy. The OSI letter is couched in terms of the requirements of the discovery rules and limiting production to documents specifically requested, not one of disclosing all exculpatory information.

## C.

The Special Master based his ultimate conclusion that Demjanjuk failed to prove fraud on the court almost exclusively on his finding that the OSI attorneys acted in good faith. While he stated that they were not reckless, he did not discuss this finding at all. Instead, he emphasized his finding that "[t]hey did not intend to violate the Rules or their ethical obligations . . . . they did not misstate facts or the law as they understood them, and did not make statements in ignorance while aware of their ignorance. Although they were blinded to what we may now perceive to be the truth, they were not wilfully blind." S.M. Report at 206.

The quoted findings are based largely on credibility determinations. Although we might not agree with each finding, giving them the required deference, we cannot find them clearly erroneous. The conclusion that the OSI attorneys were not reckless, however, stands on a different footing. Given the Special Master's finding of no deliberate or wilful failure to disclose information arising from an evil motive, we believe the type of reckless disregard to be examined in this case is the second type described in the Restatement (Second) of Torts § 500, comment (a):

> Recklessness may consist of either of two different types of conduct . . . In [the second type], the actor has . . . knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.

Such recklessness can and should be determined from an objective examination of the actions of the parties in a particular set of circumstances. We will undertake such an objective examination, accepting as true that no OSI attorney deliberately withheld from Demjanjuk or the court information that he believed he had a duty to disclose even though the withholding itself was deliberate.

## VI.

### A.

The attitude of the OSI attorneys toward disclosing information to Demjanjuk's

counsel was not consistent with the government's obligation to work for justice rather than for a result that favors its attorneys' preconceived ideas of what the outcome of legal proceedings should be. The master found that the OSI attorneys operated on the premise that Demjanjuk was Ivan the Terrible and that this belief caused them to be "inadequately skeptical" of their case when confronted with evidence pointing to Marchenko as Ivan Grozny. S.M. Report at 202–03. We do not believe their personal conviction that they had the right man provided an excuse for recklessly disregarding their obligation to provide information specifically requested by Demjanjuk (as found by the master) the withholding of which almost certainly misled his counsel and endangered his ability to mount a defense (as found by the master).

**B.**

The OSI attorneys acted with reckless disregard for their duty to the court and their discovery obligations in failing to disclose at least three sets of documents in their possession before the proceedings against Demjanjuk ever reached trial.

1. The Fedorenko Protocols should have been disclosed. They consisted of information provided by a foreign government that supplied some support to Demjanjuk's basic claim from the beginning—that he was a victim of misidentification. The statements of the two former guards at Treblinka identified one of the Ukrainians who operated the gas chambers as "Marchenko." In his statement, taken in 1945 near the end of World War II, the guard Leleko named Nikolai and Marchenko as the "motorists" and stated that Marchenko had cut women's breasts with his sword. In addition, the protocols contained the transcription of a detailed taped interrogation of Fedorenko conducted in 1973 by Soviet officials. Fedorenko stated that he remembered two guards at the gas chambers, Nikolay and Ivan. Two Jewish survivors, Rosenberg and Epstein, had also described two operators of the gas chambers called Nikolai and Ivan. Marchenko's given name was Ivan.

The guard Malagon also identified Marchenko as a motorist in a 1978 statement.

He referred to him, however, as "Marchenko, Nickolay," providing support for the OSI theory that Marchenko was the Nikolai described by some survivors and Demjanjuk was the notorious Ivan. This theory was weakened, however, by the fact that Marchenko's name appeared on the list of Treblinka personnel furnished by the Soviet government and Demjanjuk's name did not appear. This same witness, Malagon, identified Demjanjuk's photograph as that of a cook at Treblinka, not as Ivan the Terrible when he was interrogated on October 2, 1979.

The information in the Fedorenko Protocols would have bolstered Demjanjuk's contention that he was not Ivan Grozny of Treblinka, and would have provided information pointing toward Marchenko as the notorious Ukrainian. The information would have assisted the district court as well. The court heard no evidence in support of Demjanjuk's claim of misidentification beyond his own denial. This information would have shown the court that there was evidentiary support available, and in the government's possession, that supported that denial.

2. The list of Ukrainian guards at Treblinka furnished to OSI by the Polish government was certainly exculpatory. In 1982 Demjanjuk's attorney advised OSI Director Allan Ryan that he had learned of 1979 correspondence between the director of the Polish Main Commission Investigating Nazi Crimes in Poland and OSI attorney Martin Mendelsohn and requested copies "[p]ursuant to discovery motions and interrogatories...." Jt.App. 149. Attorney Moscowitz responded on August 17, 1992, enclosing copies of the reports from Poland. Moscowitz advised that OSI was furnishing the material "as a matter of courtesy and not under any obligations of discovery, which ended long ago." Jt.App. 150.

Demjanjuk's attorney persisted, asking for copies of any other documents received from foreign governments (a duty to furnish such documents existed from the time of Demjanjuk's first set of interrogatories, the master found). Attorney Bruce Einhorn replied for OSI that "all relevant and discoverable documents in the Government's possession have

been provided to you under the Federal Rules of Civil Procedure." The letter also advised that OSI had undertaken no inquiry to determine whether other documents being sought had already been provided "or indeed whether such documents even exist." Jt. App. 152.

The 1979 letter from the Polish Main Commission advised that the Commission had no data concerning Demjanjuk. Jt.App. 502. Among the documents forwarded with the director's letter was a list of known Ukrainian guards who had worked at Treblinka. Both Fedorenko and Marchenko's names appeared on the list. Demjanjuk's name did not appear.

Both Parker and Moscowitz, the two OSI attorneys most involved in preparing the Demjanjuk denaturalization case, saw the material from the Polish Main Commission. Parker testified that he thought the material had no value in the Demjanjuk case, and that he did not notice Marchenko's name. Moscowitz testified he thought it did not relate to the Demjanjuk case. This was a strange conclusion, given the fact that the director of the Commission sent the material in response to a request from OSI for information concerning Demjanjuk and two other individuals. Jt.App. 502.

The Polish Main Commission material would not have established conclusively that Demjanjuk was not a guard or motorist at Treblinka. There were approximately 100 Ukrainians there at one time or another. Nevertheless, the defense could have argued from the absence of Demjanjuk's name that surely the Polish investigation would have turned up the name of Treblinka's most notorious guard and included that person's name on the list. If Allan Ryan's proclaimed policy of furnishing everything had been followed, it is clear that the Polish documents would have been furnished in 1979, before the denaturalization trial, not three years later.

3. Otto Horn's identification of Demjanjuk as Ivan Grozny from photo spreads was extremely important government evidence at the denaturalization trial. Horn was a German guard who had been stationed at Treblinka. He was tried for war crimes in 1964 or 1965 and acquitted. His evidence was presented in the denaturalization proceedings in the form of a videotaped deposition taken in Berlin on February 26, 1980.

Demjanjuk's counsel objected to testimony on the videotape concerning the identification from photographs on the specific ground that OSI personnel had visited Horn three months earlier, in November 1979, and conducted a photo identification procedure in the absence of Demjanjuk's attorneys. Moscowitz responded that Demjanjuk's counsel had full opportunity to cross-examine Horn when the deposition was taken in 1980.

What neither Judge Battisti nor Demjanjuk's counsel knew was that the contemporaneous reports of the 1979 Horn interview by the OSI investigator and historian directly conflicted with Horn's testimony at the deposition that when he finally identified Demjanjuk's photograph in the second spread he could not see the first set of pictures. Yet, the reports both stated that Horn was unable to identify Demjanjuk's photo in the first spread and only did so while examining the second spread and noticing the resemblance between the Demjanjuk photo in that set and the Demjanjuk photo in the first spread, which was lying face-up where Horn could see it as he examined the second set.

As we have noted, Chief Judge Battisti overruled Demjanjuk's objections to the Horn video deposition and found that there were "no aberrations" in the process by which Horn identified a photograph of Demjanjuk as Ivan. We believe that if Demjanjuk's attorneys had had the investigator and historian's reports of the first session, with their strong indication of a suggestive identification procedure, they could have conducted a cross-examination of Horn at the videotaped deposition that would have raised serious questions about the witness' identification.

Both the district court and Demjanjuk's counsel were entitled to have these reports produced. Moscowitz, who was the lead attorney at the denaturalization trial, testified before the Special Master that he never read the Dougherty and Garand reports before the trial. This, despite the fact that Sinai, to

whom the reports were addressed, clearly directed that a copy be made and sent to Moscowitz. If Moscowitz did not read the reports, knowing he planned to introduce the video deposition at the trial, this failure constituted "reckless disregard for the truth."

OSI was not a large office. We can find no excuse for such casual treatment of information that could cast doubt on the validity of important testimony. Moscowitz was present at the first session with Horn, but testified that he looked away during the actual identification, leaving that to the investigator and historian. He did this, he said, in order to avoid the possibility of being called as a witness at the denaturalization trial when the deposition to be taken a few months later would be introduced. Not having witnessed the identification himself, we can find no reasonable explanation in this immense record for his failure to read and acknowledge the importance of the contemporaneous reports of the trained investigator and historian, nor can we understand how Sinai determined that two reports addressed to him should be routed to Moscowitz without even reading them.

### VII.

We consider whether the conduct outlined herein constitutes fraud on the court or attorney misconduct sufficiently serious to require corrective action on our part.

### A.

■ Fraud on the court is a somewhat nebulous concept usually discussed in civil cases. No court system can function without safeguards against actions that interfere with its administration of justice. This concern must be balanced against the necessity for finality of court judgments; thus, only actions that actually subvert the judicial process can be the basis for upsetting otherwise settled decrees.

Professor Moore's definition is frequently cited:

Fraud upon the court should ... embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct.

7 *Moore's Federal Practice and Procedure* ¶ 60.33. Cases dealing with fraud on the court often turn on whether the improper actions are those of parties alone, or if the attorneys in the case are involved. As an officer of the court, every attorney has a duty to be completely honest in conducting litigation. Professor Moore emphasizes this element of fraud in his treatise:

[W]hile an attorney should represent his client with singular loyalty, that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates fraud upon a court.

*Id.* The author cites two Supreme Court decisions that illustrate the role of attorney actions in the fraud on the court analysis. Moore distinguishes between *Hazel–Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), in which the Supreme Court did find fraud, and *U.S. v. Throckmorton*, 98 U.S. 61, 25 L.Ed. 93 (1878), in which the Court did not find fraud. While the actions taken in both cases were similar—false documents were put before the court—the attorney was implicated in *Hazel–Atlas* as one of the perpetrators, while the attorney in *Throckmorton* was not. 7 *Moore's Federal Practice* at 60–358–59. See also *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699 (2d Cir.1972), where the court of appeals as part of its finding of no fraud on the court, pointed out that none of the offending party's attorneys were involved in the alleged fraud. 461 F.2d at 702 n. 1.

When the party is the United States, acting through the Department of Justice, the distinction between client and attorney actions becomes meaningless. The Department acts only through its attorneys. Although there are cases holding that a "plan or scheme" must exist in order to find fraud

on the court, we agree with Judge Wiseman that a scheme, based on a subjective intent to commit fraud, is not required in a case such as this. Reckless disregard for the truth is sufficient.

### B.

The respondents complain that Demjanjuk seeks to hold them to the constitutional standard in criminal cases enunciated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), even though all proceedings against Demjanjuk have been civil actions. The Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Special Master stated that he believed the *Brady* rule should govern, but confined his analysis to fraud on the court in a civil context, because the Supreme Court had never stated that the *Brady* rule applies in civil cases.

### (1)

■ We believe *Brady* should be extended to cover denaturalization and extradition cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party proceeded against. If the government had sought to denaturalize Demjanjuk only on the basis of his misrepresentations at the time he sought admission to the United States and subsequently when he applied for citizenship, it would have been only a civil action. The government did not rest on those misrepresentations, however. Instead, the respondents presented their case as showing that Demjanjuk was guilty of mass murder.

The OSI prosecutors knew that *Brady* requires disclosure of exculpatory information in criminal cases. The Director of OSI, Mr. Ryan, testified that it is "fundamentally unfair" not to follow the *Brady* principle in OSI cases and that he intended for the office to follow this principle of full disclosure of exculpatory material. (Ryan Tr. at 37.) It is not sufficient to say, as the Special Master concludes, that no prosecutorial misconduct occurred under the *Brady* principle because no particular individual at OSI has been proved to have acted in "bad faith" with the express intent of suppressing exculpatory evidence.

In *Brady* itself, the Court stated that the failure to disclose material information is a due process violation "irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 86, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). Otherwise, the prosecutor can proclaim that his heart is innocent and his failures inadvertent, a claim hard to disprove, while at the same time completely disregarding his duty to disclose.

The Court has also made plain that the prosecution cannot escape its disclosure obligation by compartmentalizing information or failing to inform others in the office of relevant information. In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the government made the same "the-right-hand-did-not-know-what-the-left-hand-was-doing" argument as it makes here. The Court was quick to reject this excuse as a justification for withholding exculpatory material. The Court pointed out that "the prosecutor's office is an entity and as such it is the spokesman for the government." The Court held that the prosecutor's office—here OSI—is responsible as a corporate entity for disclosure.[2]

---

**2.** The full paragraph in which this rule is expressed is as follows:

In the circumstances shown by this record, neither DiPaoloa's authority nor his failure to inform his superiors or his associates is controlling. Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government. See Restatement (Second) of Agency § 272. See also American Bar Association, Project on Standards for Criminal Justice, Discovery and Procedure Before Trial § 2.1(d). To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.

### (2)

The record is replete with evidence that Allan Ryan was considering extradition of Nazi war criminals to Israel even before Demjanjuk's denaturalization become final. When that event occurred, the government did not deport Demjanjuk; instead, it sought his extradition for trial as Ivan the Terrible pursuant to Israel's request.

The consequences of denaturalization and extradition equal or exceed those of most criminal convictions. In this case, Demjanjuk was extradited for trial on a charge that carried the death penalty. OSI is part of the Criminal Division of the Department of Justice. The OSI attorneys team with local United States Attorneys in seeking denaturalization and extradition, and they approach these cases as prosecutions. In fact, in correspondence and memoranda several of the respondents refer to their role in the Demjanjuk case as prosecutors. We believe the OSI attorneys had a constitutional duty to produce "all evidence favorable to an accused [Demjanjuk]," which the Special Master found he had requested and that was "material ... to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196.

Thus, we hold that the OSI attorneys acted with reckless disregard for the truth and for the government's obligation to take no steps that prevent an adversary from presenting his case fully and fairly. This was fraud on the court in the circumstances of this case where, by recklessly assuming Demjanjuk's guilt, they failed to observe their obligation to produce exculpatory materials requested by Demjanjuk.

## VIII.

Several other factors revealed by this record require brief discussion.

### A.

Although the Special Master found that pressures from outside OSI did not influence the respondents' failure to disclose required information, the presence of such pressure cannot be gainsaid. In August of 1978 Congressman Eilberg, the Chairman of an important committee, wrote then Attorney General Bell a letter insisting that Demjanjuk be prosecuted hard because "we cannot afford the risk of losing" the case.[3] The trial attorney then in charge of the case, Mr. Parker, wrote in his 1980 memorandum that the denaturalization case could not be dismissed because of factors "largely political and obviously considerable." Other lawyers in OSI wrote memos discussing this case as a political "hot potato" that if lost "will raise political problems for us all including the Attorney General." (Mendelsohn, then the Director of the office, to Crosland, September 26, 1978, Pet.Exh. 113.) Mr. Ryan, Director of the office, wrote the Assistant Attorney General of the Criminal Division in 1980 that OSI had "secured the support in Congress, Jewish

---

405 U.S. at 154, 92 S.Ct. at 766.

**3.** The letter reads, in its entirety, as follows:

August 25, 1978
Honorable Griffin B. Bell
Attorney General
Department of Justice
Washington, D.C.

Dear Mr. Attorney General:

Reports have reached me that deficiencies have become apparent in the preparation of the case of *U.S. v. Demjanjuk*, a denaturalization proceeding against an alleged Nazi war criminal now living in Cleveland, Ohio.

I wish to express my strong concern over the possible inadequate prosecution of this case. A repeat of the recent Fedorenko adverse decision to the government's case in Florida would nullify and gravely jeopardize the long and persistent

efforts of this Subcommittee in ridding this country of these undesirable elements. Lack of preparation and a deep realization of the importance of these proceedings may have cost the government its decision in this case. We certainly would regret seeing this happen again.

The creation of a Special Litigation Unit within INS [predecessor of OSI] was established to bring expertise and organization to this project.

This Unit should be fully entrusted with these cases.

I would strongly urge you to place the direction of the proceedings of the DEMJANJUK case in the hands of the Special Litigation Unit. We cannot afford the risk of losing another decision.

With best wishes.
Sincerely,
JOSHUA EILBERG
Chairman
Pet.Supp.App. (1992), at 182.

community organizations, public at large for OSI—press coverage has been substantially favorable and support from Jewish organizations is now secure," but he went on to say that "this support can't be taken for granted and must be reinforced at every opportunity." (Ryan Tr. at 88.) Mr. Ryan also testified that "in 1986, which was the year before the [Israeli] trial [of Demjanjuk], I went to Israel for about 10 days on a lecture tour that was sponsored by the Antidefamation League. . . ." (Ryan Tr. at 90.) It is obvious from the record that the prevailing mindset at OSI was that the office must try to please and maintain very close relationships with various interest groups because their continued existence depended upon it.

### B.

The "win at any cost" attitude displayed by some of these record documents and statements contrasts sharply with the attitude and actions of the Israeli prosecutors, who were under domestic political pressures themselves. But for the actions of the Israeli prosecutors, the death sentence against Demjanjuk probably would have been carried out by now. He would have been executed on a charge for which he has now been acquitted.

The Israeli prosecutors did not learn of the exculpatory evidence from Russia until after the accused was found guilty and sentenced to death in the Israel trial court. They had prosecuted the case over many months and obtained the conviction and death sentence. The Israeli prosecutors then learned that there was Russian information suggesting that the charges against the accused may be false. Instead of withholding the information, the prosecutors travelled to Russia to investigate the matter thoroughly. They marshalled the exculpatory evidence, brought it back to Israel; and in the face of extremely strong popular feelings against the accused, publicly turned it over to the Supreme Court of Israel. Basically, the Israeli prosecutors confessed error in the face of intense political pressure to get a conviction. Relying on this newly discovered exculpatory evidence developed by the prosecutors, the Supreme Court of Israel reversed the convic-

10 Fed 3d--10

tion which those same prosecutors had obtained five years earlier.

### IX.

■ We have considered the possibility of treating Demjanjuk's claims as moot in view of the fact that he has now been acquitted and ordered released by the Supreme Court of Israel. Upon reflection, however, we are convinced that the collateral consequences of being found by the district court to be Ivan the Terrible require corrective action.

The petitioner was extradited in 1986 on the basis of evidence in the denaturalization case that led to a finding that he was the notorious Ivan. After a lengthy trial followed by conviction and a death sentence, he spent more than seven years in an Israeli prison. Although he was treated humanely there, he was under a sentence of death until the Israeli Supreme Court in 1993 ordered his acquittal and eventual release.

The United States Supreme Court dealt with the collateral consequences of a judgment in a criminal case with similarities to the present case in *Fiswick v. United States,* 329 U.S. 211, 222, 67 S.Ct. 224, 230, 91 L.Ed. 196 (1946). In *Fiswick,* the Court held that an appeal was not moot even though the defendant had completed his prison sentence before the appeal reached the High Court. The case involved an alien convicted of conspiracy to defraud the United States for concealing his membership in the Nazi party when registering with the Immigration and Naturalization Service. Although Fiswick was released before his case could be heard, the Supreme Court held that the harmful effects flowing from the conviction precluded mootness. The Court reasoned that a conviction for lying about Nazi involvement "stands as ominous proof that [Fiswick] did what was charged and puts beyond his reach any showing of ameliorating circumstances or explanatory matter that might remove part or all of the curse." 329 U.S. at 222, 67 S.Ct. at 230. If a conviction for merely "lying about Nazi involvement" causes such collateral consequences, surely being found by a court and convicted for being one of the most notorious perpetrators of Holocaust atrocities deserves the same consideration.

The Supreme Court has found collateral consequences sufficient to overcome suggestions of mootness in many other cases. *E.g., Ginsberg v. New York,* 390 U.S. 629, 633 n. 2, 88 S.Ct. 1274, 1277, 20 L.Ed.2d 195 (1968); *Pollard v. United States,* 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). See also *York v. Tate,* 858 F.2d 322 (6th Cir.1988) (habeas corpus petition not mooted by prisoner's release).

## CONCLUSION

We attempt to mitigate the collateral consequences of the extradition order only. As did the Special Master, however, we have considered the actions of the OSI attorneys in the denaturalization case. The extradition order was based largely on the district court's finding in the denaturalization case that Demjanjuk was Ivan the Terrible.

This court has not considered charges against Demjanjuk other than those related to the claim that he was Ivan the Terrible of Treblinka. Neither have we considered Demjanjuk's contention that the other grounds for denaturalization and deportation should be reconsidered because the "Ivan" charges overshadowed all the proof in the two earlier proceedings.

Acting pursuant to Fed.R.Civ.P. 60(b)(6) and the All Writs Act, 28 U.S.C. § 1651, we reopened the habeas corpus case in which we denied relief from the extradition order to determine whether that proceeding had been tainted by fraud on the court or prosecutorial misconduct that required our intervention. See *Harris v. Nelson,* 394 U.S. 286, 299–300, 89 S.Ct. 1082, 1090–1091, 22 L.Ed.2d 281 (1969). We also acted pursuant to our inherent power to protect the integrity of the judicial process within this Circuit. The Supreme Court has recognized a court's inherent power to grant relief, for "after-discovered fraud," from an earlier judgment "regardless of the term of [its] entry." *Hazel–Atlas Glass Co. v. Hartford Empire Co.,* 322 U.S. 238, 244, 64 S.Ct. 997, 1000, 88 L.Ed. 1250 (1944). See also *Chambers v. NASCO, Inc.,* — U.S. —, —, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991). Rule 60(b) recognizes this authority as well in noting that "[t]his rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, ... or to set aside a judgment for fraud upon the court."

Our sole concern in these proceedings, which began with entry of our order of June 5, 1992, has been to determine whether any acts or omissions of Department of Justice attorneys resulted in the district court and this court improvidently approving extradition of Demjanjuk to Israel in this habeas corpus action. We express no view with respect to charges that have been made, but not adjudicated, to the effect that Demjanjuk engaged in other activities during the Nazi period that are proscribed by the criminal laws of any nation.

For the reasons set out herein we vacate the judgment of the district court and the judgment of this court in the extradition proceedings on the ground that the judgments were wrongly procured as a result of prosecutorial misconduct that constituted fraud on the court.

## APPENDIX 1

No. 85–3435

UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

John Demjanjuk, *Petitioner–Appellant,*

v.

Joseph Petrovsky, et al., *Respondents–Appellees.*

## ORDER

Before: MERRITT, Chief Judge; KEITH, Circuit Judge; and LIVELY, Senior Circuit Judge.

The petitioner-appellant, John Demjanjuk, was extradited to the State of Israel for trial of a capital offense, the commission of war crimes during World War II. In a previous decision of this court in this case, 776 F.2d 571 (6th Cir.1985), we declined to stop the extradition by issuing a writ of habeas corpus. Our previous study of the record and

numerous recent press reports and articles in the United States indicate that the extradition warrant by the Executive Branch may have been improvidently issued because it was based on erroneous information. Consideration should be given to its validity and to whether this court's refusal to grant the petition for writ of habeas corpus was erroneous.

In our previous decision we said that the extradition should be limited:

The district court clearly certified that Demjanjuk was subject to extradition solely on the charge of murder. Though some of the acts which Demjanjuk is charged with may also constitute other offenses listed in the treaty, he may be tried in Israel only on that charge.

776 F.2d at 583.

Pursuant to the authority stated in rule 40, Fed.R.App.Proc., pertaining to the rehearing of causes previously heard and Rule 60(b)(6), Fed.R.Civ.P., pertaining to relief from judgments previously entered, the Court, upon its own motion, makes the following orders with respect to the prior proceedings concerning the extradition warrant heretofore issued in this case under Chapter 209, Title 18 (§§ 3181–3195), United States Code:

1. The United States, on or before July 15, 1992, shall file with the Court a brief describing any items of evidence of any kind, of which it has knowledge, tending to show that the petitioner-appellant, Demjanjuk, is not the "Ivan the Terrible" who committed war crimes at the Treblinka death camp, in particular murder, as described in 776 F.2d 571 (6th Cir.1985), together with a statement of approximately when agents of the United States first learned of each such item of evidence.

2. On or before July 25, 1992, the petitioner-appellant shall file a brief describing affidavits, depositions or other statements of witnesses in his possession (which are not described in the government's brief referred to in paragraph 1 above), which tend to show that a man known as Ivan Marchenko was the "Ivan the Terrible" referred to in paragraph 1.

3. On or before August 1, 1992, the parties should file simultaneous briefs stating their respective position on the question whether the Court should reconsider its earlier decision concerning the issuance of a writ of habeas corpus in this case, including the question whether the court should remand the case to the district court for a further evidentiary hearing respecting the case.

4. The Federal Public Defender for the Northern District of Ohio is hereby appointed to represent the defendant, provided the petitioner-appellant or the members of his immediate family in the United States do not object to such appointment, and provided further that he is qualified for such representation under 18 U.S.C. § 3006A.

5. An oral hearing on this matter is set for Tuesday afternoon, August 11, 1992, at 2:30 P.M.

ENTERED BY ORDER OF THE COURT

Leonard Green, Clerk

### APPENDIX 2

### No. 85–3435

### UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

John Demjanjuk, *Petitioner–Appellant,*

v.

Joseph Petrovsky, et al., *Respondents–Appellees.*

### *ORDER*

Before: MERRITT, Chief Judge; KEITH, Circuit Judge; and LIVELY, Senior Circuit Judge.

Pursuant to orders of this court entered on June 5, 1992, and June 18, 1992, counsel for the parties appeared for oral argument after having previously filed briefs and appendixes. At the commencement of oral argument the panel, speaking through Chief Judge Merritt, stated that the essential issue joined by the parties in their briefs is whether this court mistakenly affirmed the district court's denial of John Demjanjuk's habeas corpus petition. See *Demjanjuk v. Petrovsky,* 776 F.2d

571 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). The Chief Judge then stated that the court's inquiry concerns whether lawyers from the Department of Justice engaged in prosecutorial misconduct by concealing or withholding from the district court and this court evidence in their possession that John Demjanjuk was not the notorious Ukrainian guard known as "Ivan the Terrible" who operated the gas chambers at the Treblinka, Poland Nazi death camp. The "bedrock question" for the court, Judge Merritt continued, is whether the failure of the attorneys to disclose such exculpatory information constituted fraud upon the court that misled this court into allowing Demjanjuk to be extradited.

The case was ably and extensively argued by counsel and, at the conclusion of oral argument, was taken under submission by the court. Upon consideration the court concludes that further proceedings are required as set forth here.

### I.

Before outlining the additional proceedings, we dispose of the Department of Justice's contention that this court lacks jurisdiction to conduct the present inquiry. The Department argues that we have no power to review our 1985 judgment, particularly in view of the fact that Demjanjuk is now in Israel, having been convicted by an Israeli court for violation of Israeli law. We disagree. This court is proceeding under its inherent power to grant relief, for "after-discovered fraud," from an earlier judgment "regardless of the term of [its] entry." *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 244, 64 S.Ct. 997, 1000, 88 L.Ed. 1250 (1944). Furthermore, nothing requires this court to follow the "cumbersome and dilatory procedure" of sending this issue back to the district court for decision. *Id.* at 249.

The fact that a federal court has the inherent power "to vacate its own judgment upon proof that a fraud has been perpetrated upon the court" was reaffirmed by the Supreme Court at its 1990 term. See *Chambers v. NASCO, Inc.*, —— U.S. ——, ——, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991). The Court warned that, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* Mindful of this admonition, we have determined to make every effort to be certain that we have as complete a record as possible before acting upon the serious charges made by the petitioner in this case.

### II.

Counsel for the Department of Justice conceded that "mistakes were made." This admission was based upon the undisputed fact that the Department had in its possession prior to the extradition proceedings statements and documents indicating that John Demjanjuk was not "Ivan the Terrible," but that another Ukrainian guard at Treblinka, Ivan Marchenko, was the operator of the gas chambers whom the prisoners referred to by this sobriquet.

It is alleged by the petitioner that this information was known to attorneys within the Department of Justice who were involved in the Demjanjuk denaturalization, deportation and extradition proceedings, but that none of the information was produced to Demjanjuk's counsel in response to numerous interrogatories and requests, or revealed to the court. The attorneys so identified at this time are Allan Ryan, Norman Moscovitz, George Parker and John Horrigan. The first three worked within the Department in its Office of Special Investigations (or its predecessor), while Horrigan served as an assistant United States Attorney for the Northern District of Ohio. All four attorneys were involved in the proceedings against John Demjanjuk.

### III.

In order to procure information that we deem essential for reaching a decision on the issue before us, the court hereby appoints the Honorable Thomas A. Wiseman, Jr., Judge of the United States District Court for the Middle District of Tennessee, as Special Master of this Court pursuant to FED. R.CIV.P. 53(c). This reference requires the

Master to take the testimony of attorneys Ryan, Moscovitz, Parker, and Horrigan, if available, and to receive such other evidence as he may determine to be relevant and material to the issue under submission. The Master shall have all of the powers granted to such officers under FED.R.CIV.P. 53(c). After completing his duties pursuant to this order of reference, the Master will prepare a report on the matters covered by this order. He will file the report with the clerk of this court and serve on each party notice of the filing and a copy of the report together with a transcript of all proceedings and of the evidence and any original exhibits as provided in FED.R.CIV.P. 53(e)(1).

Entered by order of the court.

By: ——————————————————

Clerk

## APPENDIX 3

### EXCERPT

From the Record of Interrogation of the Defendant

February 20, 1945. I, Lieutenant EPPEL', Investigator of the Fourth Department of the "SMERSH" Directorate of Counterintelligence of the Second Belorussian front interrogated as defendant—

LELEKO, Pavel Vladimirovich, born in 1922, native of the village of Chaplinka, Chaplinka district, Nikolayev Region, Ukrainian, citizen of the USSR.

The interrogation began at 10.10 a.m.

*Question:* What was the purpose of the Treblinka camp?

*Answer:* A camp is not a quite precise definition of what was there in reality. This was not a camp, because not counting the servicing crews, nobody was housed there, but it was an especially equipped factory for the mass extermination of people.

*Question:* How long were you in service in the Treblinka camp?

*Answer:* I was in service in the Treblinka camp for one year, from September 1942 to September 1943.

*Question:* What position did you hold there?

*Answer:* In the Treblinka camp I held the position of a guard.

*Question:* Where was the Treblinka camp located?

*Answer:* The Treblinka camp was located some 500 meters from the Malkinia–Kosow highway, about two-three km from the Treblinka railroad station, at the edge of a forest. To the West of the camp, some two km away, there is the village of Kutaska.

*Question:* Describe the exterior appearance of the camp?

*Answer:* The Treblinka camp is divided into two parts: Camp no. 1, or as the prisoners called it, the "death camp", and the worker's camp, called Camp no. 2. The camps were situated at a distance of some 2–3 km from each other.

*Question:* What did the "death camp" look like?

*Answer:* The "death camp" was located on an area of about 7–8 hectares, which was fenced in by two rows of barbed wire reaching 3 (three) meters in height. Beyond the barbed wire stretched a continuous line of metallic anti-tank obstacles enmeshed in barbed wire. The entire area of the camp, in the shape of an irregular quadrangle, was divided into three sections by rows of barbed wire. The barbed wire was intertwined with bushes and branches in order to prevent the possibility of seeing from one section into the other.

*Question:* What did the first section of the "death camp" look like?

*Answer:* The first section of the "death camp" contained all the service buildings of the servicing personnel. There were there four barracks housing the Russian and Ukrainian guards, three barracks housing the Germans who directed the mass extermination of the people. The commander of the camp and his secretary lived in a separate barrack. Right by the barbed wire separating the first section from the second and the third stood the barrack surrounded by barbed wire in which were housed some 1000 prisoners condemned to death. They were

called the "worker crew" and were used to service the camp. In addition to the above mentioned barracks there were also two barracks one of which served as storage area and bakery in which the prisoners worked, and the other as a dining room for the Russians. A branch road led from the Malkinia–Kosow highway to the first section of the camp.

*Question:* What did the second section of the "death camp" look like?

*Answer:* The second section of the "death camp" was the receiving point of the doomed prisoners. A railroad branch extended here from Treblinka village. Near the railroad stood two wooden barracks in which the belongings and clothing of the people to be exterminated were stored. One of the barracks had been given the appearance of a railroad station. A wooden facsimile of a clock had been nailed above it. Prior to each arrival of a fresh batch of doomed people, one of the prisoners climbed on the roof of the barrack and moved the arms of the clock to make it show the time corresponding approximately to the actual time. A wooden sign representing a hammer and saw was nailed above the clock. Below the clock was a small panel on which the sechedule [sic] of departure of trains for L'vov, Rovno, Dnepropetrovsk, Tarnopol" [sic] and other Ukrainian cities was written in several languages. Still further down were two small windows above one of which was a sign that read "cashsinr," and above the other, another sign that read "station master". All this decoration was made in order to delude the people brought here to die. To complete the illusion, there were also large posters reading "Palestine waits for you", "the Ukraine will give you work and bread" and other slogans and appeals.

\* \* \*

Two more barracks stood about 70–100 meters from the above mentioned two barracks situated by the railroad branch and serving as storage space for belongings and clothing of the doomed prisoners. One of these two barracks served as an undressing place for the women. The men were undressed near the other barrack, right there on the street, winter and summer. The food, belonging [sic] and clothing taken from the doomed prisoners were stored inside this second barrack. Inside the women's undressing room there was also a so-called "cashier's office" where the women were ordered to hand over their money, jewelry, and valuable [sic] for "safekeeping". Beyond the "cashier's office" booth was a fenced in area where the hair of the women was cut. Men handed over their valuables and money also in a special "cashier's office" situated not far from the second barrack. Both barracks were fenced in by barbed wire.

A road led from the undressing rooms [sic] the third section of the "death camp" and terminated at the building where the extermination of people took place.

*Question:* What did the third section of the "death camp" look like?

*Answer:* The road from the undressing rooms, fenced on both sides by barbed wire intertwined with branches led to the gas chamber building where people were exterminated with gas obtained from running diesel engines. As the people directed to the gas chambers were told that they were being taken to a bath-house, the outward appearance of the gas chamber building was also made to resemble a bath house. It was a single storied brick building, its exterior covered with plaster and whitewashed. It was about 25 meters long and 15 meters wide. The entrance to the building was ornate and there were stucco moldings.

Flowers grew right by in long boxes. There was no door at the entrance. Instead of it there was a heavy hanging made from a rug. Beyond it started a narrow passage which ended at the opposite wall. To the right and to the left of the passage there were five doors that closed hermetically and led into the special chambers where the poisoning took place. The chambers were about six meters long and as wide, about two to five-three meters high. In the center of the ceiling there was an electric light bulb in which there was no wiring and there were two "shower" heads through which poisonous gas was fed into the chamber.

The walls, floor and ceiling of the chamber were of cement. On the opposite side to the entrance door there was another, likewise hermetically closing door, through which the bodies of the poisoned people were removed. As many as 500 men, women and children were pushed into the chambers indiscriminately. Eight chambers out of the ten existing in the gas chamber building were used to poison people. In the two remaining ones, there were two powerful German engines, about 1.5 meters high—two engines in all. Each engine fed gas to four death chambers. Some 20 meters from the above mentioned gas chamber building stood the building of the old gas chambers, which contained only three gas chambers. This building functioned until 1943. But as it was unable to handle the enormous number of people brought by the Germans to the "death camp", the new, large gas chamber building that I have described above was built. After it came into use, the old one was no longer utilized. An incinerator for the burning of bodies was situated about 10 meters beyond the large gas chamber building. It had the shape of a cement pit about one meter deep and 20 meters long. A series of furnaces covered on the top with four rows of rails extended along the entire length of one of the walls of the pit. The bodies were laid on the rails, caught fire from the flames burning in the furnaces and burned. About 1000 bodies were burned simultaneously. The burning process lasted up to five hours. Not far from the gas chamber building, also in the third section, there was a barrack housing the working-crew composed of doomed prisoners and which comprised up to 500 persons.

\* \* \*

*Question:* What was the system of mass extermination of people in the German death camp of Treblinka?

*Answer:* Two to three trainloads of doomed prisoners arrived daily at the Treblinka railroad station. Each train consisted of 60 cars. The train was brought in three installments into the second section of the "death camp". Twenty cars were brought in every half hour. As soon as the cars crossed the barbed wire, the guard was changed. The policemen escorting the train remained outside the camp and left on the locomotive to fetch the next batch of prisoners. The railroads [sic] cars brought into the camp were immediately unloaded by the guards. We started to unload the cars with the help of the so-called "blue crew" consisting of doomed prisoners wearing a blue armband on the sleeve. Those arriving were told that they must first go to the bath house and will then be sent further to the Ukraine. But the sight of the camp, the enormous flaming pyre burning at one end of the camp, the suffocating stench from decomposing bodies that spread form some 10 km around and was particularly strong within the camp itself, made it clear what the place really was. The people chased out of the cars with whips guessed immediately where they had been brought; some attempted to climb over the barbed wire of the fencing, got caught in it, and we opened fire on those who were trying to escape and killed them. We tried to quiet down the fear-crazed people with heavy clubs. After all those who were able to walk had been unloaded, only the ailing, the killed and the wounded remained in the railroad cars. These were carried by the prisoners belonging to the "blue crew" into the so-called "infirmary", the name given to the place where the ailing and the wounded were shot and the dead were burned. This place became particularly crowded when the prisoners marked for death who were brought in the railroad cars attempted to commit suicide. Thus, in March 1943 there arrived a train in which half of the prisoners cut their throats and hands with razors. While unloading was going on, the prisoners cut themselves with knives and razors before the eyes of us, the policemen, saying: "anyhow you will kill us". The majority of those who did not die of self-inflicted wounds were shot. After the unloading, all those who could stand on their feet were chased toward the undressing place. There the women were separated from the men and pushed into a special barrack, while the men were told to

undress right there outside another barrack. During the first years of the existence of the camp, women and men undressed together in the same barrack. But it happened once that the prisoners attacked the "chief of the working crew" in the undressing barrack. Somehow the man managed to escape from there. Several policemen and Germans immediately rushed in. One of the Germans started firing into the crowd from his submachine gun. After they had stopped shooting, the Germans and the policemen started to beat with clubs and whips those who survived. After this incident, men were assigned to a special place in the open air in which to undress, by the barrack, across from the women's undressing place. Pushed by the clubs of the Germans and the policemen, the men threw off their clothing, having first handed their valuables and money to a special "cashier's office". The women were obliged to remove their shoes before entering the undressing place. They were forced to remove all their clothing under the supervision of German policemen and prisoners of the so-called "red crew" [sic] Those who resisted were whipped. Very often the Germans and the policemen tore off and cut off the clothing of those who did not want to undress or undressed too slowly. Many women begged to be allowed to keep at least some clothing on their persons, but the German, [sic] smiling cynically, ordered them to undress "to the end". The policemen or the workers threw to the ground and undressed those who refused to do so. The undressed women were told to hand over all their valuables and money to the "cashier's office". After this the women were driven in groups to another part of the barrack, where 50 prisoners—"hairdressers" were working. The women sat on a long bench and the "hairdressers" cut off their hair. The cut hair were [sic] packed in large bags and sent by trainloads to Germany. One of the Germans told me that in Germany they are used to fill mattresses, also for soft upholstery. He said that this hair make [sic] very good mattresses and the Germans buy them willingly.

After their hair was cut the women were sent in batches to the third section of the camp, to the "bath house", but in reality to the gas chamber to be exterminated there. Before entering the gas chamber building they passed along a long path bordered on both sides with a high fence made of barbed wire and branches. Along the edge of the path stood policemen and Germans. Each one held a whip or a club. I stood repeatedly on the edge of this path with other policemen and drove along with a whip the women and the men into the gas chamber building. Many women were not quite sure that they would not be exterminated and in order to have some means of subsistence in the future, they hid some valuables on their persons. To prevent this, the Germans placed special controllers in the center of the path. When they noticed that a woman walked along the path holding her legs close together, she was stopped at once and cynically examined, and if anything was found on her, she was beaten almost to death. The men walked more quietly down this path. Several times I heard how one, speaking to another, said: "Why are you weeping? Do you believe you can arouse compassion in those Germans?" Frequently we could hear cries of "Hail Stalin!", "Hail the Red Army!" To us Russian guards, they said: "Today you exterminate us, and tomorrow the Germans will be killing you".

When the procession of doomed people approached the gas chamber building, MARCHENKO and Nikolay, the motorists of the gas chambers shouted: "Walk faster, or the water will become cold!" Each group of women or men was pushed from behind by some German and very frequently by Franz, the camp commander himself, escorted by dogs. As they approached the gas chambers, the people started to recoil in horror, sometimes they tried to retrace their steps. Then whips and clubs were used. Franz immediate [sic] ordered his dog to attack the naked people. Being trained for this, it grabbed them by their genitals. Aside from the motor operators who had dogs with them, there were five or six Germans near the gas cham-

bers. With whips and clubs they chased people into the passage of the gas chamber building and then into the gas chambers. The Germans and the motor operators then competed as to atrocities with regard to the people to be killed. MARCHENKO for instance, had a sword with which he mutilated people. He cut off the breasts of women.

When the chamber was filled to capacity, the Germans or the motorists came to the door and started beating up the naked people with a rubber whip and at the same time set their dogs against them. The prisoners shrank away into the depth of the chamber yielding place to more prisoners. Such a pressing-in occurred several times so that some 700 to 800 people could be crowded into the not-so-large chambers. When the chambers were filled to the very limit, the Germans started to throw in the children left by the women either in the undressing place or more frequently outside the gas chamber building. As the ceiling of the gas chambers was very low, the children thrown into the chamber hit the ceiling and then, disfigured, sometimes with broken heads, fell on the heads of the prisoners.

When loading of the chambers was completed, they were sealed off by hermetically closing doors. Motorists MARCHENKO and Nikolay started the motors. The gas produced went through the pipes into the chambers. The process of suffocation began. Some time after the motor had been started, the motorists looked into the chambers through special observation portholes situated near each door, in order to determine how the process of extermination was going on. When asked what they saw, the motorists answered that the people were writhing, crushing each other. I also tried to look through the porthole, but for some reason could see nothing. Gradually the noise in the chambers died down. Some fifteen minutes later the motors were stopped and there was an unusual silence.

While extermination of this batch of prisoners went on, a new bath of condemned people arrived into the camp. The entire process started all over again.

## APPENDIX 4

### RECORD

### Of Interrogation of Witness

18 March 1978

City of Zaporozh'ye

On instructions from the Procuratorate of the USSR concerning the request made by organs of Justice of the USA, and in accordance with the requirements of Article 85, 167 and 170 of the Code of Criminal Procedure of the Ukrainian SSR, Senior Investigator of the Procuratorate of the Zaporozh'ye Region and Senior Councillor of Justice Litvinenko interrogated as witness:

MALAGON, Nikolay Petrovich, born in 1919, native and resident of the village of Novo–Petrovka, Berdyansk district, Zaporozh'ye Region, citizen of the USSR, Ukrainian, manual worker, married.

The interrogation stated at 3.30 a.m.

\* \* \*

After having completed my training in the Trawniki camp, I was given the rank of "wachman". I remained in the Trawniki camp from October–November 1941 to March 1942 and then, together with ten other wachmans, we were sent to the small town of Zamoscie, where we guarded the property of a colonel. After a month we returned to the Trawniki camp, but of the four companies of guards, nobody was left except the servicing personnel. As I learned later, part of the guards had been sent to the Treblinka concentration camp and the rest to the Belsec and Lublin camps. After some time I was also sent to the Lublin camp where a team of guards (wachman) was being collected. After about five days some 50 men were assembled and we went to Warsaw where we took on guard duty for an entire train, the cars of which contained Jews: men, women and children.... Our team was headed by a certain Komarkin, the first name and patronymic of whom I do not know, but he spoke Polish well. We brought the train with the Jews to the Treblinka camp, which was situated near the station of Treblinka on Polish territory. A one-track railroad extended from the railroad station to the camp. Some of the

train's cars were driven into the territory of the camp and part remained at the station. When we arrived to the camp, other guards were already in the cordon and these began to receive the Jews we have brought. From this day I started my service in the Treblinka camp. This camp was created by the Germans with the express purpose of destroying citizens of Jewish nationality. I saw that trains carrying citizens of Jewish nationality: men, women, children, old men and women arrived regularly at the camp. These citizens were driven into a special barrack, where they removed all their clothing and threw their valuables into specially placed suitcases. Then they were chased naked to the gas chambers through special passages made of barbed wire covered with pine branches. Pipes carrying exhaust gas from running diesel motors were installed in the gas chambers and the people inside perished. The dead were then thrown into special pits and later burnt on pyres. This work was performed by special teams composed of individuals of Jewish nationality. In this camp there was also a so-called "infirmary" which was situated near the barrack where the people arriving undressed and not far from the unloading area. The infirmary was in appearance an area fenced in by barbed wire which was camouflaged with pine branches. In this area there was a pit; there were no other constructions on the territory of the infirmary. Those among the newly arrived were placed in the infirmary who could not reach by themselves the barracks in which they undressed and gave away their valuables. The principal worker in the infirmary was a man by the last name of Rebeka, I do not know his first name and patronymic; he resembled a Jew. This was the man who exterminated in the infirmary the citizens who were ailing and could not walk without help. Rebeka sometimes boasted that he worked so hard that the barrel of his submachine gun had become red. I did not participate personally in the shooting of the Jews brought in, but was only in the cordon, took part in the unloading of the Jews from the train cars, and mostly, together with the team, prepared pine and fir branches that camouflaged the barbed wires, a single line of which extended around the entire camp, and the wire of which were made the passages leading from the barracks to the gas chambers. The barbed wire around the so-called infirmary was similarly camouflaged with branches. I remained in the Treblinka camp at least three or four months and saw that at least one trainload of citizens of Jewish nationality arrived there every day and were then exterminated in the gas chambers and in the infirmary. During this time many Jews died there, but I cannot state the exact number. There were cases when the Jews brought to the camp for extermination made armed resistance: shot from pistols or threw grenades. There was no rioting among the prisoners during my time of service in the Treblinka camp. I heard that some sort of revolt had taken place, but at that time I was no longer employed in the camp.

\*　　\*　　\*

I met guard Fedorenko, I do not recall his first name and his patronymic, in the Trawniki as well as in the Treblinka camps. I met him only seldom, because he served in another platoon. I remember well his person and therefore can identify him on a photograph. In the Trawniki camp Fedorenko was also trained to be a guard (wachman) and wore a special "SS" uniform. After he had completed his training in the Trawniki camp, Fedorenko was given the title of wachman (guard). Each wachman was given 10 marks per month for tobacco. I cannot easily say how Fedorenko came to be in the Trawniki camp undergoing training for the duties of a wachman, because I did not speak with him about this. I did not meet Fedorenko in the Chelm camp and therefore I cannot say from which camp precisely he was sent to be trained in the Trawniki camp. I also met Fedorenko in the Treblinka camp, but I cannot at present remember if he was employed in this camp or brought there [sic] Jewish citizens for extermination. I remember Fedorenko only with the rank of wachman, and I do not know whether he was promoted to higher ranks and what was the attitude of the German authorities toward him. I find it difficult to say whether Fedorenko participated in the extermination of citizens of Jewish nationality in the Treblinka camp because I was not present at this. After the Treblinka camp in 1943 I did not meet Fedorenko again and his subsequent fate is unknown to me.

When the prisoners were brought to the Treblinka camp, the trains were unloaded by Germans and guards with the rank of ober-wachman, zugwachman who chased the prisoners from the cars with whips and pistols, beat them and shot at them. I hesitate to say whether Fedorenko participated or not in such actions, because I did not see this. I also did not see Fedorenko shoot down prisoners in the barracks or near the gas chambers. When the trains carrying the Jews arrived, the guards were usually in cordon formation, and the Jews were escorted to the barracks by Germans, while the Jews were exterminated by the working teams under the supervision of Germans. Near the diesel engines by the gas chambers there worked a guard (wachman) by the name of Marchenko, Nikolay, and wachman Rebeka worked in the so-called "infirmary". I remember that Marchenko wore a leather jacket and carried a pistol. These two guards did exterminate prisoners, who else among the guards took part in the extermination of prisoners I find difficult to say. When one of the prisoners on the unloading area threw a grenade, one of the guards was killed. The other guards standing in cordon formation immediately retaliated against the prisoners who had thrown the grenade, that is they shot them then and there. Who of the guards participated in this action and was Fedorenko among them I do not know. The guards with the rank of oberwachman, zugwachman, and rotenwachman were closer to the Germans, they participated in the unloading of the Jews from the traincars, and in doing so they threw people out of the train cars and shot some of them right there. Together with the Germans they also escorted the prisoners to the barrack where they removed their clothes and handed over their valuables. I cannot personally say how many prisoners were exterminated daily in the camp, but the camp had no facilities to accomodate [sic] the prisoners. All the prisoners who arrived were exterminated on the day of arrival in the gas chambers. The bodies were thrown into pits and later burned. At least a trainload of people arrived everyday, but how many doomed persons it contained I find it difficult to say.

\* \* \*

Interrogation was conducted by Senior Investigator of the Procuratorate of the Zaporozh'ye Region, Senior Councillor of Justice

Ya. V. Litvinenko.

## APPENDIX 4A

### RECORD OF QUESTIONING OF WITNESS

City of Vinnitsa

October 2, 1979

Senior Assistant Procurator of Vinnitsa Oblast' Podrutskiy, on instructions from the Procuracy of the USSR in connection with the request from the organs of justice of the USA for legal aid in the case of Ivan Dem'yanuk and in accordance with the requirements of Articles 85, 167 and 170 of the Code of Criminal Procedure of the Ukrainian SSR, questioned as a witness:

Malagon, Nikolai Petrovich, born 1919, native and resident of the village of Novo-Petrovka, Berdyansk Rayon, Zaporozhe Oblast', Ukrainian, citizen of the USSR, laborer.

Questioning began: 9:45 A.M.

\* \* \*

In response to the questioned asked, witness N.P. Malagon stated:

During the Great Patriotic War, I participated with my military unit in the defense of the city of Kiev. In August of 1941 I was wounded in the head and taken prisoner by the Germans together with other soldiers from my unit.

While a prisoner, I was first held in a POW camp in the city of Zhitomir. We were later transferred to a camp in the city of Rovno, and a day later we were transferred in railroad cars to a POW camp in the city of Chemnitz (Poland).

We were held in this camp for approximately two months. In roughly October or November of 1941 we, the POWs, were assembled near the barracks and some man unknown to me wearing civilian clothing began to select prisoners for work. He selected a total of roughly 60–70 POWs, including myself. This man did not tell us what kind of work we would be doing or where we

would do it. The selected POWs and myself were hauled in three trucks to the village of Travniki (Poland) and we were told that in this training case we could be trained as SS guards.... [W]e were [eventually] awarded the title of SS guards and issued identification....

A short time later, as part of a group of guards consisting of 20–25 men whose names I do not remember, I was sent to the Lublin camp. We worked cleaning up the area at this camp and stayed there 5–6 days. From the Lublin camp we were sent to the city of Warsaw, where we stayed approximately three days. During these three days I once guarded the Jewish ghetto. From Warsaw we, the guards, escorted a train filled with Jewish civilians to the Treblinka death camp. We were all armed with rifles and live ammunition. When we arrived at the Treblinka camp together with the prisoners, we handed them over to the camp guard. When we arrived at the camp, there were other guards there from the Travniki school.

While at the Treblinka death camp, I met the guard Nikolai Marchenko, who drove a gas chamber van. I do not know where he is at present. In the same camp I met the guard Ivan Demedyuk or Ivan Dem'yanyuk (I do not remember his name precisely). This guard was of average height and heavy build, spoke Ukrainian and had light brown hair. His speech was pure; he pronounced everything well. I do not know where he was from, since I did not talk to him about this. While I was at the Treblinka death camp, he worked there as a cook, preparing food for the guards.

I could identify the guard whom I have named as Demedyuk or Dem'yanyuk from photographs.

In February of 1943 approximately 15 of us, the guards, were transferred to the Belsen camp (Poland). Ivan Demedyuk or Ivan Dem'yanyuk remained at Treblinka. We were at Belsen for approximately five days and, since some of the guards escaped, we were once again returned to Travniki, where we were given special insignia, and then we were sent to the Auschwitz death camp. I served in this camp from March to April of 1943. Then, we were transferred to the Bu-chenwald death camp, where I served as a guard from April of 1943 through February of 1945. Here, from what other guards (whose names I do not remember) said, I learned that Ivan Demedyuk of Ivan Dem'yanyuk, who had worked as a cook at Treblinka, had been transferred to work as a gas chamber van driver. His later fate is unknown to me. I escaped from the Buchenwald death camp in March of 1945.

I have read the record of the questioning. My statements were recorded faithfully. I have no additions or corrections to make. The questioning was completed at 1:00 P.M.

(Signature) Malagon

Questioned by:

Senior Assistant Procurator, Vinnitsa Oblast' (Signature) V.L. Podrutskiy

Copy authentic:

Procurator, Vinnitsa Oblast' (Signature) G.S. Tarnavskiy

(OFFICIAL SEAL)

### RECORD OF PRESENTATION OF PHOTOGRAPHS FOR IDENTIFICATION OF AN INDIVIDUAL

City of Vinnitsa

October 2, 1979

Senior Assistant Procurator of Vinnitsa Oblast' Podrutskiy, on instructions from the Procuracy of the USSR in connection with the request from the organs of justice of the USA for legal aid in the case of Ivan Dem'yanyuk, in accordance with the requirements of Articles 85, 174 and 176 of the Code of Criminal Procedure of the Ukrainian SSR and in the presence of the witnesses:

Shembereva, Valentina Porfir'yevna, residing at No. 5 Kosmonavtov Street, Apartment No. 37, city of Vinnitsa, and

Voynitskaya, Maria Yakoylevna, residing at No. 113 Pirogov Street, Apartment No. 15, city of Vinnitsa,

presented to witness

Malagon, Nikolai Petrovich, born 1919, native and resident of the village of Novo–Petrtovka, Berdyansk Rayon, Zaporozhe Oblast',

nine photographs of men for identification. The photographs were attached to sheets No. 1, No. 2 and No. 3, designated by numbers and attached to impressions of the official seal of the Procuracy of Vinnitsa Oblast'.

Sheet of photographs No. 1 contains photographs of three men in military uniform and headgear. Sheets of photographs No. 2 and No. 3 contain photographs of men in civilian clothing, without hats. The persons shown in the photographs were not named to the witness.

\* \* \*

After examining the photographs presented to him on sheets No. 1, No 2 and No. 3, witness N.P. Malagon stated that he could not identify anyone in the photographs. The guard to whom he had referred during the questioning and whom he had called by the name of Ivan Demedyuk or Ivan Dem'yanyuk was not among them.

\* \* \*

The record of the presentation for identification has been read to us. It was recorded faithfully. We have no observations to make on the conduct of the identification or the content of the record.

Witness:    (Signature) Malagon
Witnesses: (Signature) Shembereva
            (Signature) Voynitskaya

Identification conducted and record compiled by:

Senior Assistant Procurator,
Vinnitsa Oblast' (Signature) V.L. Podrutskiy

Copy authentic:

Procurator,
Vinnitsa Oblast' (Signature) G.S. Tarnavskiy

(OFFICIAL SEAL)
\* \* \*

### CERTIFICATE

Photograph No. 3 on sheet of photographs No. 1, photograph No. 1 on sheet of photographs No. 2 and photograph No. 2 on sheet of photographs No. 3 show:

Dem'yanyuk, Ivan Nikolayevich, born 1920, native of the village of Duboviye Makharintsy, Kazatin (formerly Samgorodok) Rayon, Vinnitsa Oblast'.

The persons shown in the other photographs are not involved in the case.

Senior Assistant Procurator,
Vinnitsa Oblast' (Signature) V.L. Podrutskiy

October 2, 1979

Copy authentic:

Procurator,
Vinnitsa Oblast' (Signature) G.S. Tarnavskiy

(OFFICIAL SEAL)

### APPENDIX 5

### DEPARTMENT OF JUSTICE

TO: Arthur Sinai, Deputy Director, OSI

FROM: Bernard J. Dougherty Jr.,
        Criminal Investigator

SUBJ: HORN, Otto—Report of Interview

REF: OSI # 42—DEMJANJUK, Iwan

On November 14, 1979, Otto Horn, German national and citizen of West Berlin, was interviewed at his residence, Yorck–Strasse 66, Berlin, Germany, by Norman Moscowitz, Staff Attorney–OSI, and by the reporting officer. Due to the fact that HORN neither spoke nor understood English, the entire interview was conducted in his native German language, with George Garand–OSI and the reporting officer translating. Theinterview [sic] began at 9:04 a.m.

. . . .

During the course of the questioning concerning the operation of the gas chamber, HORN voluntarily mentioned one "Iwan" (last name unknown), who was one of two Ukrainians who were responsible for the actual operation of the engines which provided

the gas for the chambers. HORN was unable to recall the name of the other Ukrainian, describing him as tall and thin, with blond hair, and being approximately 22–23 years of age. HORN further recalled that the two Ukrainians were immediately subordinate to a German, known only as "Schmidt."

HORN described "Iwan" as being of stocky build, black hair cut short, full rounded face, tall, with no distinguishing marks on his face. HORN remarked that "Iwan" had some technical ability, since he repaired and maintained the gas engine and was known by HORN as being able to drive an automobile (apparently somewhat of a rare [sic] among the Ukrainians at that time). HORN indicated that he arrived at Treblinka during September, 1942 and stated that "Iwan" was already working there. HORN added that "Iwan", Schmidt, and the other unidentified Ukrainian were the only three individuals who actually worked at the gas chamber, that is, in the operation of the engine. HORN stated that for the period September 1942–September 1943, when he was at Treblinka, "Iwan" worked at the gas chamber every day.

. . . .

[T]he reporting officer advised HORN that there were a series of 8 photographs of caucasian males, which he was requested to review carefully and individually. Each of the photographs depicted an individual in dark clothing. Prior to the interview, care was taken to minimize the amount of uniforms which would be readily discernable in each photograph. Nevertheless on a few photos, a portion of a uniform could be seen. Each picture showed the bust of the subject. The individuals possessed hair of different length, varying physical buildings, and a variety of ages, ranging from the early twenties to the forties. One of the photographs was that of Iwan DEMJANJUK, taken during the early 1940s. HORN studied each of the photographs at length but was unable to positively identify any of the pictures, although he believed that he recognized one of them (not DEMJANJUK) but was not able to indicate where he had met this person or provide his name.

The first series of photographs was then gathered and placed in a stack, off to the side of the table—with that of DEMJANJUK lying face up on the top of the pile, facing HORN. The reporting officer then presented another series of 8 photographs, each depicting the bust of a male caucasian. These photographs showed the individuals in clothing more similar to that normally worn by civilians. Among the 8 pictures was one of Iwan DEMJANJUK, which had been taken during the early 1950's. This photograph was much better in quality than that presented to HORN in the first series, and depicted DEMJANJUK as having a much fuller and more rounded face. HORN studied this photograph at length, and upon glancing at the earlier picture of DEMJANJUK, identified them as being the same person. As he continued to study the picture from the second set, HORN indicated that it certainly resembled the man that he had known as "Iwan", although he stated that "Iwan" had had somewhat more hair. He further mentioned that the second picture, depicting the fuller face, was much more like that of "Iwan" than the person shown in the first series. After a few more moments of careful study, HORN positively identified the photographs of Iwan DEMJANJUK as being the "Iwan" that he knew at the gas chamber in Treblinka.

. . . .

## APPENDIX 6

### DEPARTMENT OF JUSTICE

TO: Arthur Sinai, Deputy Director, OSI

FROM: George W. Garand, Historian

SUBJECT: HORN, Otto—Report of
Interview

REF: OSI #42—DEMJANJUK, Iwan

On the morning of 14 November 1979 Norman Moscowitz, Staff Attorney, OSI, Bernard J. Dougherty, Jr., Criminal Investigator, and George W. Garand, Historian, OSI interviewed the German national Otto HORN at his residence located at 66 Yorkstrasse, West Berlin. The interview began shortly after 0900 and ended shortly before 1000. Mr. Dougherty and the undersigned translated during the interview which was conducted in German since HORN is conversant only in that language.

HORN is 76 years old and lives in a small one-bedroom apartment by himself. His place of residence was meticulously clean and despite his advanced years he conveys the impression of being stable with an excellent recall of events during the time he was stationed at Treblinka. Shown a sketch of the death camp at the beginning of the interview he identified various buildings within the camp without hesitation. He was assigned to the camp for approximately one year, from September 1942 to September 1943, and specifically to the upper part of the camp which housed the gas chambers.

. . . .

[A] German named SCHMIDT or SCHMITT would supervise the actual gassing. Two Ukrainians worked directly under Schmidt. One of these operated the machinery that funneled the lethal gas into the chamber while the other supervised the inmate work detail that removed the bodies from the chamber and dumped them into two very large pits that had been dug nearby. While the Ukrainians at the train unloading platform rotated between there and the guard towers the two Ukrainians assigned to the gas chamber itself were invariably present at each gassing. He no longer recalled the name of the Ukrainian responsible for overseeing the removal of the bodies, but had a good recall of the one responsible for operating the death machinery. That man's first name was Iwan, a tall heavy set individual approximately in his mid-twenties at the time with shortly cropped hair and full facial features. He never knew Iwan's family name since such names were in any case very difficult to pronounce and the Ukrainians were invariably addressed only by their first names.

. . . .

Initially shown a series of eight photographs of Caucasian males, HORN carefully viewed each photograph that depicted an individual wearing dark clothing. Each one of the photographs showed a frontal view of the individual down to a few inches below the neck. Hair styles of these individuals varies, as did length of hair, physical stature and age that varied from the low twenties into the forties. One of the photographs depicted IWAN DEMJAN-JUK as he appeared in the early 1940s. After studying each of the photographs at length HORN initially could not make positive identification of any of the individuals though on one or two occasions he felt that one or two of the individuals shown looked vaguely familiar to him, though he could not recall where and under what circumstances he had met them. At this point the first group of photographs was gathered up and placed on one end of the table with the one depicting DEMJANJUK left facing upward on top of the pile. Mr. Dougherty thereupon presented a second series of eight photographs to the interviewee, each showing a second group of male Caucasians clothed in what would normally be considered closer to civilian attire than the clothing worn by most members of the first group. One of the photographs in the second group was that of IWAN DEMJANJUK, taken in the early 1950s and depicted DEMJANJUK with a fuller and more rounded face and a more receding hairline. HORN studied this photograph intensively and then, looking at the earlier photograph of DEMJANJUK, identified that individual on both. Nevertheless, he noted some minor differences, such as Iwan having had somewhat more hair at the time he knew him.

. . . .

15 November 1979

/s/ George W. Garand
    Historian, OSI

## APPENDIX 7

UNITED STATES GOVERNMENT

*Memorandum*

TO: Walter J. Rockler and Allan A. Ryan, Jr.
    Director          Deputy Director, Litigation

DATE: February 28, 1980

146–2–47–43 SI

FROM: George Parker
        Trial Attorney

SUBJECT: Demjanjuk Memo

I am usually reluctant to reduce to writing that which I have written in the attached

memo. I was convinced, however, that it was imperative to focus your attention on the issues that have arisen in handling this case which now necessitate a resolution. The memo obviously needs to be discussed. I am perfectly willing to wait until Norman and John return from Europe and are able to join the discussion. I nonetheless urge you to read this before they return and be prepared to make a decision shortly after they return. I anticipate the judge will set this case for a final pre-trial as early as March 15, 1980.

## Memorandum

TO: Walter J. Rockler and Allan A. Ryan, Jr.
    Director          Deputy Director, Litigation

DATE: February 28, 1980

146-2-47-43 SI

FROM: George Parker
      Trial Attorney

SUBJECT: Demjanjuk—A Reappraisal

### Background

In 1977, the U.S. Attorney's office in Cleveland, Ohio filed a denaturalization suit alleging in essence that the defendant should be stripped of his citizenship because he had lacked the requisite good moral character for citizenship on account of his status and actions as a guard at the Treblinka extermination camp. No mention was made in the pleadings of Sobibor or the Trawniki Training Camp. The complaint was filed on the basis of witness statements received from the Israeli police. The statements were credible inasmuch as these same individuals had identified the photograph of Fedorenko as a guard at Treblinka and Fedorenko subsequently admitted he had been a guard. Moreover, any serious doubt as to the witnesses sincerity was assuaged by the circumstance that the INS officials had advised the Israelis that Demjanjuk was thought to have been as [sic] Sobibor. When the first two Treblinka survivors who identified Demjanjuk's photo as a guard at Treblinka were informed by the Israeli investigator that it was believed that the man was at Sobibor, the witnesses insisted that this man had been at Treblinka between 1942–1943.

So at the time of filing, the only indication the government possessed that Demjanjuk was at Sobibor was a brief reference in a book written by Michael Hanusiak called Lest We Forget. It recited that a man named Danilchenko met Demjanjuk as a guard at Sobibor in the spring of 1943, and that subsequently he, along with Demjanjuk was transferred to Flossenburg where they guarded political prisoners. Despite a specific request to the Soviets for information pertaining to Demjanjuk, none was forthcoming.

### Demjanjuk at Sobibor—Evidence Developed

The initial allegation against Demjanjuk by Hanusiak included reference to a document—a card issued at the Trawniki Training Camp bearing a photograph similar to that of Demjanjuk and biographical information identical to that of the defendant's. John Horrigan set out to secure a copy of it. He succeeded in securing a photocopy from private sources. Still we needed a copy from official sources. In August 1979, Norman Moscowitz prepared a request for the card, a statement from Danilchenko and any other witnesses. In January 1980 we received a certified copy of the card from the Soviets plus statments [sic] from Danilchenko and two other guards at Sobibor. The card is identical to that which Horrigan had previously received and which had been published in Hanusiak's book. The card states that Demjanjuk was assigned to Sobibor in the spring of 1943. (Attachment A)

The statement of Danilchenko is consistent with and elaborates upon the information attributed to him by Hanusiak. (Attachment B) He identifies him by name and photo. Most significant, perhaps, is Danilchenko's assertion that at Flossenberg [sic] all the Ukrainian guards were tattooed on their left arm above the elbow with their blood type. Also noteworthy is Danilchenko's claim that Demjanjuk stood taller than six feet.

Demjanjuk has continuously denied being at either extermination camp. Nevertheless, information he has supplied renders this denial dubious when read in the context of this case. First, in his Application for Assistance

from the IRO in 1948, he stated that he had been a farmer at Sobibor from 1937 to 1943. (We received this form within the last 8 months.) Second, at his deposition taken on February 20, 1980, he admitted that he had been tattooed by the Germans on his left arm, above his elbow, with his blood type.

The Soviet Union and Poland have each investigated the crimes committed at Treblinka. Each has compiled lists of Ukrainian guards known to have worked at Treblinka. The two Ukrainians who incessantly worked at the gas chambers were well known (Fedorenko refers to them by first names in his statement to INS officials in February 1976). Given these circumstances it is disturbing, as Norman Moscowitz has pointed out repeatedly, that Demjanjuk's name does not appear on either list.

### Admissible Accusatory Evidence

If this case were to be tried in April 1980, we can reasonably expect to present the following evidence to prove that Demjanjuk was trained as a guard by the Germans: (1) He was a Russian soldier attached to the artillery, who received a back injury and was captured by the Germans at a battle at Kerch on the Crimea in either November 1941 or May 1942. (2) He was placed in two successive POW camps, Povno and Chelm where living conditions were horrible and from which the Germans selected POW's with mechanical skills and inoffensive political backgrounds to train as camp guards. (3) He was at Trawniki as indicated by the card received by the Soviets. At Trawniki the Germans trained Ukrainian POW's to be ghetto and extermination camp guards. The POWs did not knowingly volunteer [sic] for either the training camp nor their ultimate camp assignments. The signatures of the German officials, Teufel and Streibel, whose names appear on the cards will be authenticted [sic] by Schaefer, a volkdeutsche, who worked at the camp. Unfortunately, Schaefer cannot say he has ever seen this type of card. Consequently, the judge may not even admit the card into evidence, but he probably will. But since we cannot trace its history for the last 38 years, we cannot expect the court to extend too much weight to the card.

We can reasonable [sic] expect to present the following direct evidence that Demjanjuk was at Sobibor: The Trawniki card which is fraught with problems described above. Danilchenko's statement is obviously hearsay and is in all probability not even a literal statement. Demjanjuk's testimony that his blood type was marked on his arm is of little significance without the admission of Danilchenko's testimony.

Finally, we can reasonably expect to present the following evidence that Demjanjuk was at Treblinka: (1) the testimony of two or three Israeli's and one German, each of whom was initially interviewed by the Israeli Police. Each will identify the defendant as Ivan the Ukrainian who worked at the gas chambers and brutally beat Jews solely on the basis of the defendant's visa photograph taken in 1952. They will state that the photograph bears a striking resemblance to Ivan—that like the photo he had protruding ears, short receding hairline, full face, broad shoulders and stood about 175 cm. (5'8"). The three Israeli witnesses are unwilling to say with absolute certainty that the photo is of Ivan. These three individuals also identified Fedorenko and two of them testified at his trial. (2) The testimony of Otto Horn, a German officer who worked near the gas chambers, who like the Israelis can identify Demjanjuk only by his photographs. (3) The testimony of one American survivor whose identification is also based on photos, and whose statement is considerable [sic] weaker than those of the others. (4) Possibly, the testimony of a survivor living outside the U.S. and Israel who was initially interviewed by American consulate officials. (Now being done)

### Flaws with Treblinka Evidence

The reliability of the Treblinka evidence is flawed by the following: (1) Its premised exclusively on the basis of photographs which may at best closely resemble the facial features of man witnesses knew. Survivors are more likely to recognize the photograph taken in 1952 than that taken in 1942 at Trawniki as man they knew at Treblinka. (2) Several Treblinka survivors, including SS officer Suchomil, insist that Ivan rarely if ever left the camp. Indeed, Suchomil insists that Ivan was at the camp continuously from July 1942 until November 1943, at which time he

departed along with Kurt Franz, Suchomil and others for Trieste, for the purpose of establishing other camps. (3) The witnesses fairly consistently, with the exception of Franz, say that Ivan was one of the taller Ukrainians, about 175 cm. whereas Demjanjuk is now and was at the time he applied to enter the U.S. closer to 6'1". (4) The conflicting Sobibor, Flossenburg, and Regensburg statement from Danilchenko which cannot be reconciled with information supplied by Suchomil and others.

*Strategic Options; Ethical Responsibilities*

We have little admissible evidence that defendant was at Sobibor yet serious doubts as to whether he was at Treblinka. Even if we may be comforted that we may have the right man for the wrong act, the ethical cannons [sic] probably require us to alter our present position. I will now discuss several options theoretically available to us and my recommendation with respect to each.

A. *Maintain Status Quo.* Proceed with the Treblinka case as presently plead. Positive factors: (a) the trial is likely to be scheduled within the next 100 days so it's to [sic] late to ask to change our pleadings. (b) Any attempt to change our pledings [sic] would appear to be a sign of weakenss [sic] or indecisiveness. (c) We believe our witnesses to be sincere in their identification and will be credible witnesses, and (d) even if he was at Sobibor there is some possibility he was also at Treblinka or that he was committing offensive acts at Sobibor. Negative Factors: (a) We have good reason to believe he was at Sobibor and as such could not have been at Treblinka. (b) Canon 7–103, and Ethical Consideration EC 7–13,14 of the ABA Code of Professional Responsibility cautions against a public prosecutor going forward in a criminal cause with a case with which he has serious doubts.

Although this is not a a [sic] criminal case per se, I think the deprivation the defendant will suffer if he loses requires us to follow this stricture of the code. If this canon does, in fact, apply, then I must, based upon my knowledge of this case, strongly recommend against this first option.

B. *Amend to Strike Treblinka and Supplement Trawniki and Sobibor.* We submit an extensive alteration to our pleadings. Although this amendment may most closely parallel what we now believe to be the truth, I consider it tactically suicidal. The positive factors are: (a) we believe he was at Sobibor and assisted directly in the persecution of civilians as is reflected in Danilchenko's statement recently received along with two other Soviets who were guards and recall Demjanjuk by name. Their statements dovetail with the Trawniki card and are circumstantially supported by Demjanjuk's assertion to the IRO that he was at Sobibor from 1937 to 1943 and that he was tattooed by the Germans. The negative factors are: (a) the case is reduced to the weight the court will give the Trawniki card. Since the card is primarily a supply card issued to a trainee at Trawniki and only incidentally refers to Sobibor, we cannot reasonably expect the Court to find him culpable of any more that [sic] being a trainee of the Germans by no volitional act of his, and his subsequent failure to report this training to screening officials. I consider this option to be a strategic blunder. Legally and ethically, our viable choices (assuming my analysis of my ethical responsibilities is correct) are reduced to the following two.

C. *Dismiss the Case—at Least Temporarily.* If we don't believe he was at Treblinka and lack the evidence at the present time to prove that he was at Sobibor as a guard, then dismiss it—at least until the Soviets make Danilchenko available. The negative factors are largely politicl [sic] and obviously considerable, and it should be remembered that the judge may not permit us to dismiss in such a fashion that allows us the possibility to refile against him at a later time alleging his involvement in Sobibor. Finally, we do believe that he was a guard at Sobibor and may therefore lose opportunity to proceed against him entirely.

D. *Amend Pleadings—Add Sobibor and Trawniki to Treblinka Allegations.* Move to amend pleadings to give defendant notice that we now allege that he was at Sobibor as of the spring of 1943 and previously received training as a camp guard. At trial our focus

will be substantially altered from that of showing he was the operator of the gas chambers who commited [sic] heinous acts. We will instead focus on the fact that he was a Russian POW who was trained by the Germans as a guard and that he was a guard at an extermination camp. We will not employ survivors of Treblinka to describe in excruciating detail what bestial acts he commited [sic] as Ivan the Terrible. Instead we will simply employ one or two witnesses (preferably non-Israelis) to testify that they saw him at Treblinka as a guard, the Trawniki card to prove that he was at Trawniki and Sobibor. Since we will have no way to account for what he did at Sobibor, we will focus on the fact that he was a guard and if he had disclosed it to either a displaced persons official or a vise [sic] consul he would have been rejected without resort to further investigation. The positive factors are: (a) This approach focuses on what we believe to be true (that he was an extermination camp guard), and deletes that which we have reason to think untrue (that he was Ivan the Terrible who worked the gas chambers at Treblinka), and speaks to that which is legally sufficient (he lacked the good moral character to be an American citizen because he illegally entered the country, because he gave false testimony to the vice consul as to his activities and if he had disclosed them, he would have been rejected. (b) It keeps us in the case against an individual we reasonably believe would not have been allowed to enter the country if he had disclosed the truth. The negative factors are: (a) so long as we cannot prove with clear and convincing evidence that he was at Sobibor, and do not believe the [sic] he was at Treblinka, option D is simply a ruse to avoid the ethical problems which beset option A, even if we do not identify him as Ivan the Terrible at Treblinka. (b) He disclosed to all officials that he was at Sobibor, and he was not required nor specifically asked what his activities were at Sobibor at the visa issuing stage. The pleadings at present state only that he failed to disclose to the vice consul his activities as a guard.

To date, I have opposed arguments that we amend the pleadings to include references to Sobibor or Trawniki. Further, I had believed until recently that the Department would not seriously consider dismissal of the case in its present posture despite our gnawing doubts as to its veracity. I am now in favor of performing radical surgery on the approach we take in handling this case. I believe that we must decide no later than one week after Norman and John return from Europe what course we should take and then take every step necessary and appropriate to implement that decision. My belief that a change is necessary is predicated on my assessment that Demjanjuk could not have been Ivan the Terrible at Treblinka as well as the Demjanjuk known to Danilchenko at Sobibor. A reading of the Canons of Ethics persuades me that I cannot pursue this case simply as a Treblinka matter on the premise that it is tactically shrewd and morally acceptable because we think he was a guard elsewhere.